**KING BROADCASTING COMPANY, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents.**

No. 88–1367.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 22, 1988.

Decided Nov. 1, 1988.

Henry Geller, with whom Donna Lampert and Edward W. Hummers, Jr., Wash-

ington, D.C., were on the brief, for petitioner.

Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., with whom Diane S. Killory, Gen. Counsel and C. Grey Pash, Jr., Counsel, F.C.C., Washington, D.C., were on the brief, for respondents. John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondents.

Andrew Jay Schwartzman, Washington, D.C., was on the brief for amicus curiae, Telecommunications Research and Action Center, urging affirmance.

Before WALD, Chief Judge, and EDWARDS and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

The petitioner, King Broadcasting Company ("King"), asks this court to overturn a Federal Communications Commission ("FCC" or "Commission") order denying a request for a declaratory ruling that the petitioner would be exempt from the "equal time" requirements of section 315 of the Communications Act, 47 U.S.C. § 315 (1982) in its presentation of programs designed to cover the presidential election. King argues that the FCC's refusal to construe the exemptions of section 315(a) so as to cover King's proposed programs results in an impermissible construction of the statute and, even if it does not, it violates the First Amendment by stifling a public debate that would otherwise ensue. On the record before us, it appears that the FCC has failed to apply the statute in a manner consistent with its own precedent, and no adequate justification has been offered to explain this failure. Therefore, we will remand this case to the agency for reconsideration without reaching the constitutional question.

## I. BACKGROUND

### A. Statutory Structure

Section 315(a) of the Communications Act provides that whenever a licensed television or radio broadcast station permits "a legally qualified candidate for any public office" to "use" a station, it "shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station." 47 U.S.C. § 315(a) (1982). In 1959, the FCC ruled that the news coverage of the official duties of the incumbent mayor of Chicago triggered the "equal time" requirement. *In re Telegram to CBS, Inc. (Lar Daly)*, 18 Rad.Reg. (P & F) 238, *recon. denied*, 26 F.C.C. 715 (1959). This prompted Congress to amend section 315(a) to exempt four categories of broadcast programs from the statutory equal time requirements:

(1) bona fide newscast[s],

(2) bona fide news interview[s],

(3) bona fide news documentar[ies] (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or

(4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto).

Pub.L. No. 86–274, § 1, 73 Stat. 557 (1959) (*amending* 47 U.S.C. § 315).

Until 1975, the FCC interpreted these exemptions fairly narrowly. For example, in 1962, the agency held that the fourth exemption, dealing with "on-the-spot coverage of bona fide news events," did not extend to political debates. *See The Goodwill Station, Inc.*, 40 F.C.C. 362 (1962); *National Broadcasting Co. (Wyckoff)*, 40 F.C.C. 370 (1962). In *Aspen Institute*, 55 F.C.C.2d 697 (1975), *aff'd*, *Chisholm v. FCC*, 538 F.2d 349 (D.C.Cir.), *cert. denied*, 429 U.S. 890, 97 S.Ct. 247, 50 L.Ed.2d 173 (1976), however, the Commission reversed itself and expanded the scope of the fourth exemption in light of what it then saw as a correct reading of the statute and its legislative history. In *Aspen*, the Commission considered Congress' objectives both to treat all candidates equally and to ensure maximum coverage of news events, and extended the section 315(a)(4) "on-the-spot

coverage" exemption to include debates staged by nonbroadcast entities such as the League of Women Voters; and in 1983, the Commission extended the exemption to cover debates sponsored by broadcasters as well. *See Henry Geller,* 95 F.C.C.2d 1236, *aff'd sub nom. League of Women Voters Educ. Fund v. FCC,* 731 F.2d 995 (D.C.Cir. 1984).

While the legislative intent of the 1959 exemptions is "not-so-clear" with respect to many concrete situations, *see, e.g., Chisholm,* 538 F.2d at 352, two objectives are indisputable. First, "Congress' central concern ... was to overrule the Commission's *Lar Daly* decision" in order to restore the understanding that "equal time" need not be provided when the candidate was the subject of "a routine news broadcast"; doing otherwise "deterred the broadcast media from providing the public with full coverage of political news events, and many other news events as well." *Branch v. FCC,* 824 F.2d 37, 43–44 (D.C. Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988). Second, of equal and opposite concern was Congress' fear that these exemptions would license favoritism or bias on the part of the news media—the very things that the equal time principle was designed to avoid. Thus, Congress aimed to enact provisions for exemptions to achieve the first objective without destroying the second. *See, e.g.,* 105 Cong. Rec. 14451 (1959) (remarks of Sen. Engle) (Congress should not override the primary "purpose and function of section 315(a), [*i.e.,*] to prevent a candidate from acquiring an unfair advantage over an opponent through favoritism of a station"); *id.* at 14439–40, 14445.

## B. *Facts and Prior Proceedings*

In February 1987, King[1] asked the FCC to declare exempt under section 315(a) two proposed program formats for future coverage of the major party candidates in the 1988 presidential and vice presidential elections. Both programs were to be pre-taped

"studio events." The first would be a one-hour program in which each of the two major party candidates would be allotted thirty minutes to "set forth their essential campaign message to the American people." Joint Appendix ("J.A.") 43. In order to best accommodate hectic campaign schedules, each candidate would be recorded separately, but they would be broadcast back-to-back, with one candidate's presentation followed immediately by that of the other. There would be two such presentations, one at the start of the campaign season and one just before the election. The order of presentation would be determined by a coin flip for the first show, and would be reversed in the second show. Between these two broadcasts, King proposed "an in-depth, in-studio separate interview with the two candidates of probably 45 minute duration (90 minutes for both)," also presented back-to-back, moderated by a journalist interviewer who, along with the questions and format, would be "supplied by the licensee, acting in concert with other interested licensees." J.A. 44.

Without a section 315(a) exemption, the equal time requirements of section 315 posed a serious problem for King, because numerous minor party candidates run in presidential elections. According to figures compiled by the *Congressional Quarterly,* there have been between twelve and fifteen minor party candidates in five of the last seven presidential elections since 1960. In 1980, there were eighteen; the fewest has been eight, in 1964. J.A. 29–40. However, with the notable exceptions of 1968, in which Independent George Wallace garnered 13.5 percent of the popular vote, and 1980, in which Independent John Anderson took 6.6 percent, the aggregate vote total of all minor party candidates has never reached two percent of the popular vote, *id.,* leading some to call these candidates "fringe" candidates. If forced to give equal time for thirty-minute presentations to all such candidates for president, King claimed that it would be required to spend millions of dollars to devote hours of

---

1. In the original FCC proceedings, the petitioners were WEBE–108 Radio Company along with King Broadcasting Company. Since that time,

WEBE was sold to a new owner who does not seek review of the FCC action.

prime time to messages that would likely be little-watched. J.A. 8–9 & n. 5. Faced with this dilemma, King chose not to produce the programs. Thus, King argued, as applied to the unique situation of the presidential general election, the equal time requirements of section 315 chill speech (*i.e.*, the *offering of free broadcast time* to the major party candidates) to such an extent that they violate the First Amendment.

Referring to the broad discretion the FCC retains in designing how best to promote public political discourse, King argued that the Commission could avoid this alleged chilling of speech by extending the section 315(a)(4) exemption under the same rationale that it had used in extending section 315(a)(4) to cover political debates. In fact, petitioner asserted, there was "no difference between ... an in-studio debate and an in-studio joint or back-to-back appearance of the candidates in a series of programs." J.A. 24–25.[2]

In a Staff Ruling, the Commission held that King's proposed broadcasts were not exempt from the equal opportunities requirements either as "bona fide news interview[s]," 47 U.S.C. § 315(a)(2), or as "on the spot coverage of bona fide news events," *id.* § 315(a)(4). *See* J.A. 45–47. It rejected the contention that the proposed format was enough like a debate to be exempt under section 315(a)(4), because "[i]ntrinsic to debates and press conferences is the presence of the press and/or the other candidates to question and challenge the candidate and to provide a degree of spontaneity to the event." J.A. 46. Relying on *Aspen*'s designation of the "[f]ree-wheeling, wide open" nature of press conferences as a guard against favoritism, the FCC concluded that without this element of "spontaneous interaction, WEBE's apparent *carte blanche* provision of free air time to the two major candidates

to present 30–minute 'position papers' on various campaign issues is, in our view, more like advertisements by the candidates than *bona fide* news programming." *Id.*

The FCC Staff Ruling also rejected King's contention that the ninety-minute interview show should be exempt. Because of its interview format, it was assumed that the program could only fall under section 315(a)(2)'s "bona fide news interview." The Commission therefore concluded that section 315(a)(2) could not apply because of Congress' clear intention under this subsection to limit the exemption to programs that were "regularly scheduled," J.A. 45–46. The congressional debates specifically mentioned programs such as "Face The Nation" and "Meet The Press," 105 CONG. REC. 17779 (1959) (remarks of Cong. Moss), as examples of programs that would qualify for a section 315(a)(2) exemption. The petitioner's program was not of this nature, and thus could not be exempted under section 315(a)(2). J.A. 45–46.

Finally, the Commission rejected King's constitutional challenge. Citing *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), King argued that if a regulation were shown to chill speech, then it "would indeed be a serious matter." *Id.* at 393, 89 S.Ct. at 1808. Stressing the narrowness of this attack, King continued that even if a statute were held to be generally constitutional (as section 315(a) was in *Branch v. FCC, supra*), it could be struck down if particular applications created unconstitutional results. King alleged that such was the case when applying section 315(a) to presidential elections. The FCC found "no basis for action" on King's constitutional allegations, J.A. 46, because it was only for Congress to alter the statute to accommodate additional special circumstances.[3]

---

2. King has also argued that the fact that these programs would be broadcast no more than three days after taping supports their construction as "on-the-spot" coverage of news events. However, *Geller, supra,* had already settled this question in King's favor by holding that delayed rather than contemporaneous rebroadcasts of news events did not spoil their exemption under section 315(a)(4). 95 F.C.C.2d at 1246–47.

3. Without ruling on the constitutional question, we only note here that King misreads *Red Lion,* which stated that an equal time requirement for licensees was constitutional as statutorily enacted in section 315, even absent the flexibility added through the 1959 exemptions. 395 U.S. at 391, 89 S.Ct. at 1807.

When the FCC denied the petitioner's application for review of the FCC Staff Ruling, J.A. 57, review was sought in this court. Petitioner alleges that the FCC's determination is in error as a matter of statutory application, and that even if it is not, the FCC should have used its "wide discretion" in its interpretation of its enabling statute to avoid an unconstitutional result. Determining the case, as we do, on the statutory question, we refrain from making unnecessary constitutional determinations. *See Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 345–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

## II. ANALYSIS

### A. *Standard of Review of the FCC's Statutory Construction*

Since this case presents "a pure question of statutory construction, our first job is to try to determine congressional intent, using 'traditional tools of statutory construction.' If we can do so, then that interpretation must be given effect...." *NLRB v. United Food & Commercial Workers Union*, — U.S. —, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987) (quoting *INS v. Cardoza–Fonseca*, 480 U.S. 421, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987)). If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue," *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), then the question for the court becomes whether the agency's construction of the statute is "permissible," *id.*, that is, one that is "rational and consistent with the statute." *United Food & Commercial Workers*, 108 S.Ct. at 421. *See International Union, United Mine Workers v. Federal Mine Safety and Health Review Comm'n*, 840 F.2d 77, 81 (D.C.Cir.1988). Moreover, in determining the permissibility of the statutory construction, we must "consider the consistency with which an agency interpretation has been applied." *United Food &*

*Commercial Workers*, 108 S.Ct. at 421 n. 20. We now turn to the task of applying the *Chevron/NLRB* tests.[4]

### B. *Application of the Chevron/NLRB Tests*

1. Exemption for "Bona Fide News Interview[s]"

■ With respect to the "bona fide news interview" exemption under section 315(a)(2), the FCC's construction of the statute is plainly correct under the first prong of *Chevron/NLRB*. The legislative history exhibits a clear congressional intent that programs be "regularly scheduled interviews" to fall within the statutory exemption under section 315(a)(2). This interpretation was adopted by the FCC in *Aspen, supra*, 55 F.C.C.2d at 708–12, and was affirmed by this court in *Chisholm v. FCC, supra*. Even the appellant accepts that, given *Aspen*, its proposed program format cannot be exempt under section 315(a)(2). Appellant's Brief at 31–32. Thus, we accept the FCC's position that the proposed broadcasts are not exempt from the equal time requirements through a section 315(a)(2) "bona fide news interview" exemption.

2. Exemption for "On-the-Spot Coverage of Bona Fide News Events"

■ The resolution of this case is not so clear, however, with respect to the fourth exemption under section 315(a)(4), dealing with "on the spot coverage of bona fide news events." We recognize that, because the statute is "silent or ambiguous" on this question, we must defer to the agency's judgment if it reflects a "permissible construction of the statute." However, as we have already noted, in determining whether an agency's statutory construction is "permissible" under the second prong of *Chevron/NLRB*, we must consider whether the agency has been consistent in its interpretation of the statute. *United Food & Commercial Workers Union*, 108 S.Ct. at

---

**4.** For convenience, we will use the shorthand reference to *"Chevron/NLRB"* in discussing the standard of review.

421 n. 20. On the record before us, we find that the FCC's present construction of section 315(a)(4) cannot be squared with prior pronouncements on the issue. Furthermore, we can discern no reasonable explanation for the FCC's apparent departure from its own precedent. We therefore remand for further consideration by the FCC.

In response to a question at oral argument, counsel for the Commission stated that the FCC analysis of section 315(a)(4) was conducted under the first prong of *Chevron/NLRB*. That is, according to counsel, the FCC had concluded that congressional intent to reject application of section 315(a)(4) to the proposed programs was clear, and thus the FCC was bound by this congressional directive. However, in a letter from the FCC to this court subsequent to oral argument, the Commission retreated somewhat from its assertion that congressional intent with respect to the proposed programs was clear. This retreat seems well-advised. In our view, congressional intent on the application of secion 315(a)(4) to the proposed broadcasts simply cannot be discerned using the traditional tools of statutory construction.

The legislative history does not admit of any clear determination as to whether or not King's proposed series of programs—involving back-to-back statements by the candidates, followed by back-to-back moderated interviews, and back-to-back rebuttals—falls under the fourth exemption. On the one hand, King's proposal is neither clearly "advertising" nor "stump speeches," as the FCC suggests. Moreover, Congress did not specifically preclude this hybrid format. On the other hand, while Congress surely wanted to overrule *Lar Daly, see, e.g., Branch,* 824 F.2d at 43–44, and thus ensure that bona fide news could be covered without triggering equal time requirements, it is not at all clear how far Congress wanted to go in balancing the philosophy of equal time and a station's need and right to cover news. *See, e.g.,*

105 CONG. REC. 14444 (1959). Indeed, because of the complexity of this issue, the FCC reversed itself on the question whether "debates" fall under section 315(a)(4). In short, there is no easy answer to the issue at hand, and, whatever the correct resolution, it cannot be found in the statute or its legislative history. Thus, with the knowledge that Congress has not specifically addressed the issue, we are constrained to remand for an agency determination as to whether King's proposed hybrid format falls within the exemption. Under *Chevron/NLRB*, the FCC must fill the gap left by the statute.

Even if the FCC purported to fill the gap in addressing the statute's ambiguity, as is suggested in the follow-up letter to oral argument, we still must remand because the result reached by the agency is impermissible under the second prong of *Chevron/NLRB*. The Commission's interpretation is inconsistent with its prior analysis in similar situations without any acknowledgement of the fact, or cogent explanation as to why. In *Aspen,* the Commission interpreted the statute to require two related inquiries when determining whether a proposed program qualified for a section 315(a)(4) exemption. First, the Commission asked if the program was genuinely "newsworthy," and second, whether this newsworthiness was manifested by a belief on the part of the broadcaster or network, in the "exercise of good faith news judgments," that the program was eligible for a section 315(a)(4) exemption. 55 F.C.C.2d at 708.[5] In the case before us, the FCC failed to apply this test. Nowhere does it mention appraising either the program's bona fide newsworthiness or the broadcaster's own good faith judgment regarding the program's newsworthiness.[6] While the FCC may permissibly change its approach to interpreting a statute, it may not do so without reasonable explanation.

---

5. The *Aspen* test has been followed and approved in *In re Kennedy for President Comm.,* 77 F.C.C.2d 964 (1980), *aff'd, Kennedy for President Comm. v. FCC,* 636 F.2d 417 (D.C.Cir.1980).

6. This court has embraced the importance of "newsworthiness as the basis for an exemption" in *Branch,* 824 F.2d at 45 (quoting *Office of Communication of the United Church of Christ v. FCC,* 590 F.2d 1062, 1065 (D.C.Cir.1978)).

We understand the FCC's aversion to allowing section 315(a)(4) to become a "catchall for programming not otherwise exempt" to circumvent the statutory equal time mandate. J.A. 46.[7] However, this need cannot suspend the Commission's duty to engage in reasoned decisionmaking in explaining and applying agency precedent that appears to be on point.

### III. CONCLUSION

Accordingly, we remand the case to the FCC for determination of whether the proposed programs fall within the section 315(a)(4) exemption as analyzed pursuant to the *Aspen* criteria. Of course, this panel does not urge the FCC to exercise its discretion under the second prong of *Chevron/NLRB* in any particular way. It must merely fill the gap left by the statute and do so in a way that reasonably addresses any retreat from precedent.[8]

*So ordered.*

---

**7.** It is noteworthy that, in upholding the FCC's judgment in *Aspen*, this court in *Chisholm* approved the Commission's decision that a program can be exempt under section 315(a)(4) even though it does not satisfy the requirements for an exemption under section 315(a)(2). 538 F.2d at 354 n. 8.

**8.** We recognize that the FCC may not be able to reconsider this case before the completion of the current presidential election. This has not deterred us in our consideration of this appeal, however, because there will still be a live controversy even if the election occurs before this case is resolved. The FCC's construction of the equal time requirement will remain in effect after the November election, so there will still be a concrete dispute regarding the correctness of the agency's interpretation of the statute, and the agency's enforcement of the statutory rule

will continue to have a direct impact on King Broadcasting. *See, e.g., Payne Enterprises v. United States,* 837 F.2d 486, 490–91 (D.C.Cir. 1988); *Better Gov't Ass'n v. Department of State,* 780 F.2d 86, 90–92 (D.C.Cir.1986). Even if this case could be viewed as moot, the "capable of repetition, yet evading review" exception to the mootness doctrine would apply. *See Roe v. Wade,* 410 U.S. 113, 124–25, 93 S.Ct. 705, 712–13, 35 L.Ed.2d 147 (1973); *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). If King is forced to wait until the next presidential election to contest the agency's construction of the equal time requirement, it will once again face the problem of the challenged action being too short in duration to be fully litigated before the occurrence of the election.