**INTERNATIONAL BROTHERHOOD of ELECTRICAL WORKERS, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and the United States of America, Respondents,**

**Chicago & North Western Transportation Company, Intervenor.**

**No. 87–1629.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 9, 1988.

Decided Nov. 25, 1988.

Michael S. Wolly, Washington, D.C., for petitioner.

Evelyn G. Kitay, Atty., I.C.C., with whom Robert S. Burk, Gen. Counsel, John J. McCarthy, Jr., Deputy Associate Gen. Counsel, I.C.C., John J. Powers, III and Robert J. Wiggers, Attys., Dept. of Justice, Washington, D.C., were on the joint brief, for respondents. John Fonte, Atty., Dept. of Justice, Washington, D.C., also entered an appearance, for respondent U.S.

Stuart F. Gassner and Christopher A. Mills, Chicago, Ill., were on the brief for intervenor, Chicago & North Western Transp. Co.

Before EDWARDS, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In 1981, the Interstate Commerce Commission ("ICC" or "the Commission") authorized Chicago and North Western Transportation Company ("CNW") to abandon two rail lines. Under the terms of the authorization, CNW was required to apply employee protective conditions on behalf of workers adversely affected by the planned abandonments. When a dispute arose over the implementation of the employee protective conditions, the matter was properly submitted to arbitration for resolution. Following arbitration, however, the ICC asserted authority to review the arbitrator's decision. The petitioner, International Brotherhood of Electrical Workers ("IBEW" or "union"),[1] argued that the ICC had no jurisdiction to review the arbitration award, but the ICC disagreed. Upon reviewing the award, the ICC upheld the arbitrator's decision in favor of the aggrieved employee. IBEW now petitions this court to reverse the ICC's decision that it has authority to review arbitration judgments settling disputes over the interpreta-

tion, application or enforcement of labor protective conditions.

The question posed for this court is one of first impression. Although the ICC has required the use of arbitration for a number of years to resolve disputes over labor protective conditions, neither the agency nor the courts heretofore have had occasion to decide whether the ICC may assert jurisdiction to review an arbitrator's decision. In our view, the ICC's determination that it may review arbitration awards under the Interstate Commerce Act, 49 U.S.C. § 10903 (1982) ("ICA"), is permissible and not contrary to precedent. We further find that the ICC has provided a rational basis for asserting jurisdiction to review arbitration awards in select cases. Accordingly, we deny the petition for review.

## I. BACKGROUND

In 1981, acting pursuant to 49 U.S.C. § 10903 (1982), the ICC authorized CNW to abandon two rail lines.[2] In approving the abandonments,[3] the Commission required CNW to observe the employee protective conditions formulated by the ICC in *Oregon Short Line R. Co.—Abandonment–Goshen*, 360 I.C.C. 91 (1979) ("*Oregon III*"). The *Oregon III* conditions require compensation for employees adversely affected by rail line abandonments. The conditions specify, in addition, that arbitration may be used in the event that the carrier and its employees cannot agree on the disposition of claims for protective benefits. Article I, section 11, of *Oregon III* provides:

11. Arbitration of disputes—(a) In the event the railroad and its employees or their authorized representatives cannot settle any dispute or controversy with respect to the interpretation, application or enforcement of any provision of this appendix ... within 20 days after the

---

1. IBEW served as the employees' collective bargaining representative and as their advocate during the arbitration proceeding.

2. On January 28, 1981, and on November 17, 1981, the Commission authorized, respectively, the abandonment of rail lines between Dubuque

and Oelwein, Iowa and between Oelwein and Randolph, Minnesota.

3. Section 10903(b)(2) instructs that certificates of abandonment issued by the Commission "shall ... contain provisions to protect the interests of employees."

dispute arises, it may be referred by either party to an arbitration committee.

\* \* \* \* \* \*

(c) The decision, by majority vote, of the arbitration committee shall be final, binding, and conclusive and shall be rendered within 45 days after the hearing of the dispute or controversy has been concluded and the record closed.

360 I.C.C. at 101.

Following the ICC's authorization of the CNW abandonments, a dispute arose over payments due to Daniel Scheele, a CNW electrician. IBEW presented claims to CNW for the employee's moving expenses and the losses incurred in selling Scheele's home in Oelwein.[4] CNW refused to pay the claims and, pursuant to *Oregon III,* the matter was submitted to a Board of Arbitration ("the Board"). In January 1986, the Board held that Scheele was entitled to a sum of $17,377.98, which included the loss sustained on the sale of his home, some mortgage interest payments, moving expenses, and an interest penalty.

In March 1986, CNW filed a petition for administrative review of the Board's decision.[5] CNW argued that the Commission had authority to review the award on two grounds: first, CNW read *Oregon III* as a *delegation* of the Commission's authority to resolve disputes over labor protective conditions, which preserved the Commission's final say on the matter; second, CNW pointed to 49 U.S.C. § 10903(b)(2), which requires the Commission to impose employee protective measures in rail abandonment situations. IBEW opposed CNW's petition on the ground that neither *Oregon III,* nor the ICA, nor any Commission precedent regarding protective conditions, provided support for such a review.[6]

On April 28, 1987, the Commission held that it had jurisdiction to review arbitration decisions; upon review of the merits of the case, the ICC upheld the Board's award of benefits to Scheele. The Commission stated, however, that in this and in future cases it would limit its review to "recurring or otherwise significant issues of general importance regarding the interpretation of our labor protective conditions." 3 I.C.C.2d at 736.

In its decision, the Commission first noted that "there is no specific Commission precedent to rely on in resolving this [jurisdictional] issue." *Id.* at 732. Previous ICC "cases [did] not address the question presented here: what happens *after* an issue has been submitted to arbitration." *Id.* at 735 (emphasis in original). Pointing to precedent involving the former Civil Aeronautics Board ("CAB"), the Commission found that "proper implementation of the statute may compel our review when an arbitration decision raises issues concerning our statutory responsibility to impose labor protection." *Id.* at 733. The Commission also looked to earlier instances in which the Commission had to answer questions raised "as to whether collective bargaining agreements ... conform[ed] with statutory requirements for protection, and questions defining the scope or coverage of imposed conditions." *Id.* (footnotes omitted). While expressing the "continue[d] belie[f]" that mandatory arbitration is appropriate for the final resolution of causation issues," the Commission concluded that "nothing in the mandatory arbitration requirement forecloses us from considering whether our abandonment decisions (and labor protection conditions) have been properly interpreted or carried out as we intended." *Id.* at 735 (footnote omitted).

---

**4.** In particular, the union requested payment of the mortgage interest, the realtor's commission and the judgment-type interest on all amounts due on the old house, as well as $500 to prepare Scheele's new home for occupancy. *See ICC v. Chicago North Western Transp. Co.—Abandonment,* 3 I.C.C.2d 729, 729–30 (1987) ("*ICC v. CNW*").

**5.** CNW also petitioned the U.S. Court of Appeals for the Seventh Circuit for review of the Board's

decision. *See Chicago & North Western Transp. Co. v. United States and ICC,* No. 86–1394 (7th Cir. filed Mar. 12, 1986). CNW, however, asked the court to hold its review in abeyance pending the Commission's decision.

**6.** IBEW also challenged the timeliness of CNW's petition. The union does not, however, raise this matter in this appeal. Brief for Petitioner at 5 n. 4.

The petitioner claims that, because the ICC has no authority to review arbitration decisions settling disputes over the interpretation, application or enforcement of labor protective conditions, the agency exceeded its jurisdiction in reviewing the Board's award in this case.[7]

## II. ANALYSIS

### A. *Justiciability*

This case comes to us in a somewhat unusual posture, because the ICC upheld the union's position on the merits of the arbitration award. Given this state of the record, it might be claimed that there is no justiciable controversy before the court. However, at oral argument, counsel for both the ICC and the petitioner asserted that IBEW has standing to pursue this appeal, that the case is not moot and that the appeal is ripe for review. We agree.

■ First, with respect to IBEW's standing to maintain this appeal, the union's interest in resolving the jurisdictional issue is sufficient to meet any constitutional requirements. The ICC stated that "[t]he *principal issue* raised by CNW's petition is our jurisdiction to review the Board's award to Mr. Scheele." 3 I.C.C.2d at 732 (emphasis added). Therefore, in pursuing this appeal, the petitioner is not merely quibbling over the agency's rationale in a case in which it has prevailed. The main focus of the union's defense before the agency was that the ICC lacked jurisdiction even to consider this type of case. Even if the resolution of this issue is seen as "collateral" to the merits of the case, the union has been adversely affected by the Commission's holding. Because of the ICC's decision to review arbitration awards, the union will be subject to agency review in future cases involving disputes over employee protective conditions.[8]

This injury is similar to interests held to be sufficient to confer appellate standing on an otherwise prevailing party. In *Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 59 S.Ct. 860, 83 L.Ed. 1263 (1939), the interest identified was the prospect that an unfavorable ruling would act as collateral estoppel in subsequent litigation. *Id.* at 242, 59 S.Ct. at 860–61; *see also Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 337, 100 S.Ct. 1166, 1173, 63 L.Ed.2d 427 (1980) (indicating that the interest in *Electrical Fittings* concerned the collateral estoppel effects of the decision). The plaintiffs in *Deposit Guaranty National Bank* were found to have a continuing stake in a case where they had prevailed on the merits but had lost on the class certification issue. Their interest was the desire to shift part of the litigation costs to the other class members. 445 U.S. at 336, 100 S.Ct. at 1173.

Because the petitioner in this case will be forced to litigate future arbitration awards before the ICC, it has a personal stake sufficient to meet the demands of article III. The union is no less injured by the ICC's reviewability ruling than it would have been if the Commission had promulgated a rule in an informal rulemaking under 5 U.S.C. § 553 (1982). It will incur the costs of resisting challenges to arbitration awards and the delays that such reviews entail. In other words, there is no doubt as to IBEW's standing in the classic sense of the term, and there is no doubt that the case before us is not moot.

■ Second, although neither side raises the point, there is a question whether the instant appeal is ripe for judicial review. The ripeness doctrine is designed

> to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects

---

**7.** IBEW's petition for review was originally filed in the Seventh Circuit. By order of the Seventh Circuit, the review proceeding was transferred to this circuit. *See International Bhd. of Elec. Workers v. ICC and Chicago & North Western Transp. Co.*, 832 F.2d 91 (7th Cir.1987).

**8.** The Hobbs Act, which governs judicial review of final orders promulgated by the ICC, requires that a party be aggrieved to petition a court of appeals to review an ICC order. 28 U.S.C. § 2344 (1982).

felt in a concrete way by the challenging parties.

*Abbott Laboratories v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515, (1967). As we noted in *Better Government Association v. Department of State,* 780 F.2d 86 (D.C.Cir.1986),

> [a]lthough it is true that "ripeness law overlaps at its borders with Article III requirements of case or controversy," its application in the present case implicates the doctrine in only its prudential aspects. In that form, the ripeness inquiry takes into account pragmatic concerns regarding "the institutional capacities of, and the relationship between, courts and agencies." These concerns include "the agency's interest in crystallizing its policy before that policy is subjected to judicial review," "the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting," and "the petitioner's interest in prompt consideration of allegedly unlawful agency action." In *Abbott Laboratories,* the Supreme Court announced the two-prong test for ripeness that balances these interests. The test requires a court to evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."

*Id.* at 92 (quoting *Eagle–Picher Indus., Inc. v. EPA,* 759 F.2d 905, 915 (D.C.Cir. 1985) and *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515) (footnotes omitted).

No one disputes that the Commission's jurisdictional holding is fit for judicial review. The question is a purely legal one; any necessary factual findings have been fully developed in the proceedings below. The ICC's decision is "crystallized," *Eagle–Picher,* 759 F.2d at 915; indeed one is hard-pressed to imagine how the issue could arise in "some more concrete and final form." *Id.* (quoting *Continental Airlines, Inc. v. CAB,* 522 F.2d 107, 124–25 (D.C.Cir.1974) (en banc); *see also Payne Enterprises, Inc. v. United States,* 837 F.2d 486, 492–93 (D.C.Cir.1988).

The agency's labelling of the jurisdictional issue as "principal" confirms the Com-

mission's position at oral argument that its institutional interests support immediate adjudication. The union has made equally clear that its interests do so as well. In light of the fact that the agency consistently has asserted its right to review arbitration awards since its decision in this case, Joint Brief of Respondents ICC and USA at 11, we can see no judicial institutional interest that militates against review at this time. Thus, we find judicial review appropriate in this case.

### B. Statutory Authority

On the merits of this appeal, the petitioner first claims that the ICC is without authority under the ICA to review arbitration awards resolving disputes over labor protective conditions. On this point, the petitioner appears to contend that, under the statute governing the agency, the ICC cannot reclaim the authority that it has delegated to arbitrators to interpret, apply and enforce labor protective conditions. We find this position wholly untenable.

### 1. Standard of Review

■ Since the union's claim under the ICA presents "a pure question of statutory construction, our first job is to try to determine congressional intent, using 'traditional tools of statutory construction.' If we can do so, then that interpretation must be given effect...." *NLRB v. United Food & Commercial Workers Union, Local 23,* — U.S. ——, 108 S.Ct. 413, 421, 98 L.Ed. 2d 429 (1987) (quoting *INS v. Cardoza–Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987)). If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue," *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984), then the question for us becomes whether the ICC's construction of the statute is "permissible," *id.,* that is, one that is "rational and consistent with the statute." *United Food & Commercial Workers,* 108 S.Ct. at 421; *accord International Union, United Mine Workers v. Federal Mine Safety & Health Review*

*Comm'n,* 840 F.2d 77, 81 (D.C.Cir.1988). Moreover, in reviewing the permissibility of a statutory construction, we must "consider the consistency with which an agency interpretation has been applied." *United Food & Commercial Workers,* 108 S.Ct. at 421 n. 20.

### 2. The ICA

█ We begin by examining the ICA itself. The ICA is silent with respect to the ICC's reviewing powers in arbitration cases. The ICA requires only that the certificates of abandonment issued by the Commission "contain provisions to protect the interests of employees." 49 U.S.C. § 10903(b)(2). Nothing in the Act either requires or forecloses the agency's use of arbitration in employee disputes, or limits agency review of arbitration decisions.

Thus, this court must defer to the ICC's interpretation in filling any gaps in the statute if the ICC has done so in a permissible manner. *See Chevron,* 467 U.S. at 842–45, 104 S.Ct. at 2781–83. The Commission formulated employee protective conditions pursuant to the ICA in *Oregon III.* In that decision, the ICC also determined that disputes over the application of protective benefits would be submitted to arbitration. Neither party disputes that it is "rational and consistent with the statute" for the ICC to use arbitration to resolve disputes over employee benefits. However, it is also conceded that there is nothing in the statute that *mandates* the decision in *Oregon III* regarding use of arbitration. The ICC acted within its sound discretion in electing to use arbitration; had it not done

so, all disputes over employee protective conditions would have remained solely within the primary jurisdiction of the agency. The ICC surely did not make an irrevocable delegation to arbitrators pursuant to *Oregon III,* and we can find nothing in the statute prohibiting the agency from reviewing significant arbitration awards in order to make certain that they accord with ICC regulations. The ICC, after all, formulated the employee protective provisions and was not required to rely on arbitration in the first place. The agency's interpretation of its authority under the ICA is plainly permissible.

### 3. Judicial and Agency Precedent

The petitioner argues that even if the agency's present construction of the statute is facially permissible, it should nonetheless be reversed because it is inconsistent with judicial precedent, and because it constitutes an unexplained change in the agency's construction of the ICA. *See King Broadcasting Co. v. FCC,* 860 F.2d 465, 469–71 (D.C.Cir.1988). We reject both of these contentions.

IBEW claims that several judicial decisions establish that "arbitration has consistently been deemed to be the final step in the [employee protection] process," Brief for Petitioner at 9, and that the Commission lacks jurisdiction or authority under the ICA to proceed further once arbitration has been imposed. We disagree. The ICC has never before been asked to *review* an arbitration decision, and no court has directly addressed the issue. This is thus a case of first impression.[9]

---

**9.** See, for example, *Brotherhood of Locomotive Eng'rs v. ICC,* 808 F.2d 1570 (D.C.Cir.1987), in which the court upheld the ICC's decision in favor of arbitration, finding that "[t]he Commission properly viewed the [employee protective] ... arbitration procedures as the methodology by which the disputes over the interpretation and application of the [employee protective] conditions were to be analyzed and resolved." 808 F.2d at 1578 (footnote omitted). We *did not,* however, address the separate question whether, under the ICA, the ICC could later review the arbitration decision.

In *United Transportation Union v. Norfolk & Western Railway Co.,* 822 F.2d 1114, 1115 (D.C. Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct.

700, 98 L.Ed.2d 651 (1988), this court explicitly left open the question whether an arbitration award in a consolidation case was "final" under the ICA, precluding further ICC review. *Id.* at 1119 n. 13. Similarly, in *Walsh v. United States,* 723 F.2d 570 (7th Cir.1983), the court considered whether the ICC or an arbitrator should decide in the first instance a factual issue about the petitioner's entitlement to protective arrangements. *See id.* at 572. The court found that the contract at issue imposed mandatory arbitration of the petitioner's dispute over the protective conditions. *Id.* at 574. But the court did not decide whether the ICC could later review the arbitrator's interpretations of the labor provisions.

Furthermore, our review of ICC decisions convinces us that the Commission has not interpreted its statutory authority inconsistently. IBEW claims that *Oregon III*, in which the Commission announced its imposition of employee protective conditions, made arbitration decisions regarding those conditions absolutely "final, binding, and conclusive." 360 I.C.C. at 101. This brief language does not establish, however, that the ICC was renouncing all authority to review arbitration awards. More important, however, is that the Commission has stressed in the instant case that it will limit its review to "recurring or otherwise significant issues of general importance regarding the interpretation of [its] labor protective conditions." 3 I.C.C.2d at 736. The Commission has no intention of interfering with "the arbitrators' special role in resolving disputes," *id.*, and will not "review arbitrators' decisions on issues of causation, the calculation of benefits, or the resolution of other factual questions." *Id.* Thus, the Commission's decision to clarify the meaning of *Oregon III* through review in selected cases will not measurably interfere with the overall finality of arbitration decisions and is not inconsistent with the Commission's decision in *Oregon III*.

IBEW also relies on *Leavens v. Burlington Northern, Inc.*, 348 I.C.C. 962 (1977), for the proposition that "arbitration procedures are the proper mechanism for adjudication of individual labor controversies." Brief for Petitioner at 10. *Leavens* involved, *inter alia*, a dispute over the adequacy of relocation payments in a merger proceeding. The Commission recommended the use of arbitration to resolve the dispute *in the first instance.* *See Leavens*, 348 I.C.C. at 979. The Commission did not determine, however, that it had no authority to review the arbitrator's

award. Indeed, the Commission implied that it had reviewing power over arbitration decisions, writing that "[the ICC] should not exercise jurisdiction over individual controversies when appropriate arbitration procedures are *yet* to be utilized." *Id.* at 979 (emphasis added).

The decision in *Bell v. Western Maryland Railway Co.*, 366 I.C.C. 64 (1981), offers the strongest support for the union's position, but it too falls far short of saying that *Oregon III* represents an irrevocable delegation of agency authority to resolve disputes over labor protective conditions. In *Bell*, the Commission decided to allow the arbitrator to define the term "employee" and to decide whether the term applied to the petitioner. The Commission explained that it had "consistently declined to precisely define 'employee' on the ground that once the protective conditions have been imposed, the matter is for interpretation by the courts." *Id.* at 66 (citation omitted). The Commission also wrote that "[o]nce protective conditions have been imposed, our power of review is limited and possibly we may not retain jurisdiction to make the findings petitioner seeks." *Id.* at 67. *Bell* does not establish, however, that the ICC believed that it *never* had jurisdiction to review an arbitration decision involving employee protective conditions or that it would refuse to do so in cases involving important interpretations of those conditions.

Accordingly, we find that the ICC's construction of the ICA in this case is not inconsistent with its past interpretation of the Act.[10] While arbitration boards previously have operated under *Oregon III* without ICC review, the ICC has never before been asked to review an arbitration award, nor has it addressed its authority to do so. When confronted with this question in this

---

10. The ICC also relied on cases holding that the CAB had authority both to require arbitration of disputes over labor protective conditions and to review the judgments of arbitration panels. *See, e.g., Wallace v. CAB*, 755 F.2d 861 (11th Cir.), *reh'd denied*, 762 F.2d 1023 (1985) (en banc); *Pan American Airways v. CAB*, 683 F.2d 554 (D.C.1982); *Transport Workers Union v. CAB*, 725 F.2d 775 (D.C.Cir.), *cert. denied*, 469 U.S. 818, 105 S.Ct. 87, 83 L.Ed.2d 33 (1984). We find these decisions to be somewhat helpful but not dispositive in analyzing the statutory question before us. The CAB enforced employee protective measures pursuant to an entirely different statutory scheme from the one governing the ICC. Therefore, our judgment regarding the legality of the ICC's action must involve more that just a consideration of precedent involving the CAB.

case, it was reasonable for the ICC to determine that it had authority to review interpretive issues about the employee protective provisions that it had formulated. There was no inconsistency in this response.

### 4. Conclusion on Statutory Authority

We find that the ICC's determination that it had statutory authority to review the arbitration award was a permissible construction of the ICA. The statute itself is silent on the issue, and the ICC's filling in of gaps is consistent with the terms of the ICA itself, the relevant case law involving the employee protective provisions of the ICA, and the ICC's own decisions. Accordingly, we defer to the agency's interpretation of its governing statute.

### C. *Substantive "Arbitrary and Capricious" Review*

■ Our next task is to review the substance of the ICC's decision independent of questions of statutory authority. *See Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1024–25 (D.C.Cir.1978) (explaining the distinction between "statutory" and "substantive" review). Even if the ICC is not without authority under the ICA to review arbitration awards, a question remains whether the agency's announced decision to do so was "arbitrary or capricious." *See* 5 U.S. C. § 706 (1982). In other words, we must consider whether the agency abused its discretion in exercising the quasi-legislative authority delegated to it by Congress. *Weyerhaeuser*, 590 F.2d at 1025.

■ The Supreme Court has explained substantive review as follows:

The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 [83 S.Ct. 239, 246, 9 L.Ed.2d 207] (1962). In reviewing that explanation,

we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.*, [419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)]; *Citizens to Preserve Overton Park v. Volpe*, [401 U.S. 402, 416, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971)]. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. *SEC v. Chenery Corp.*, 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995] (1947). We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc., supra*, at 286. [95 S.Ct. at 442.] See also *Camp v. Pitts*, 411 U.S. 138, 142–143 [93 S.Ct. 1241, 1244, 36 L.Ed.2d 106] (1973) (*per curiam*).

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). IBEW argues that the ICC's decision to review arbitration awards is arbitrary and capricious because it is inconsistent with ICC precedent and is unreasonable on policy grounds. We reject the petitioner's arguments on both counts.

First, as we concluded above, the ICC's decision to review arbitration awards was not inconsistent with its earlier precedent. The issue of its reviewing powers has never before been raised, and the Commission's resolution of that issue in this case does not conflict with its earlier rulings.

Moreover, even if the Commission's decision in this case represented a new approach to arbitration, this court has recognized that "[c]hanges in agency policy are not ... *per se* arbitrary and capricious action." *Pennsylvania v. ICC,* 561 F.2d 278, 291 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1011, 98 S.Ct. 723, 54 L.Ed.2d 754 (1978). When a court "examines a change in agency policy, the key factor that guides the scrutiny is whether the policy change has been adequately explained and justified so that the parties upon whom the policy will have an impact understand the newly adopted agency position." *Id.* at 291; *see also Greyhound Corp. v. ICC,* 551 F.2d 414, 416 (D.C.Cir.1977). The Commission justified its policy by explaining that "[p]rinciples of judicial economy and efficiency would be served by providing the courts with the benefit of [its] expertise prior to the time they engage in their review." 3 I.C.C.2d at 734. The Commission reasoned that the "proper implementation of the [ICA] may compel our review when an arbitration decision raises issues concerning our statutory responsibility to impose labor protection." *Id.* at 733. The Commission also looked to common sense as a further justification for its position:

> We approved these abandonments and formulated the *Oregon III* labor protection provisions at issue here. Therefore, we know best what we intended *Oregon III* (and our abandonment decisions) to mean. Because this action raises issues within our special competence and expertise, it makes sense that we resolve, in the first instance, whether our intent has been carried out.

*Id.* at 733–34 (citations omitted).

We conclude that the Commission has offered a reasoned explanation for its decision to review arbitration awards, and that this decision was not arbitrary or capricious. During oral argument, counsel for the petitioner suggested that the ICC will be flooded with arbitration cases, resulting in long delays in litigation over employee protective conditions, if the agency is afforded the power of review. This forecast is founded solely on speculation, so there is no way for us to assess it. If the union

proves to be right in its prediction, then the agency may have a problem to deal with in the future. For now, however, it is not our place to second guess the Commission's expertise in this matter or to "substitute [our] judgment for that of the agency." *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2866.

The petitioner also suggests that the ICC's decision should be rejected as arbitrary and capricious because it is patently "implausible." *Id.* On this point, the union argues that the decision in *Oregon III,* requiring parties to use arbitration to resolve disputes over employee protective conditions, rested in part on the Commission's acknowledged lack of expertise in this area. The union thus asks, if the ICC lacks the expertise to decide the cases that have been delegated to arbitration, how is the agency equipped to review those same cases once arbitration has been completed? This question raises a reasonable inquiry under *State Farm,* but it assumes too much.

It is true that the ICC in the past has suggested that arbitration is the best mechanism for adjudication of individual labor controversies. *See, e.g., Brotherhood of Locomotive Engineers v. Chicago & North Western Transp. Co.,* 336 I.C.C. 857, 860–61 (1983). But the decision at issue here is not inconsistent with this position. The Commission has made it clear in the instant case that it will limit its review to "recurring or otherwise significant issues of general importance regarding the interpretation of [its] labor protective conditions." 3 I.C.C.2d at 736. The Commission has indicated no intention to interfere with "the arbitrators' special role in resolving disputes," *id.,* and it has stated that it will not "review arbitrators' decisions on issues of causation, the calculation of benefits, or the resolution of other factual questions." *Id.* The Commission surely has the expertise to determine whether its own regulations and the statute have been followed in the resolution of disputes over labor protective conditions. Accordingly, we can find no inconsistency between the current position of the agency allowing for limited re-

view of arbitration decisions and past decisions requiring the parties to use arbitration in the first instance. The ICC's approach poses no anomaly.

### III. CONCLUSION

We can find no merit in the petitioner's claims in the instant case. Therefore, for the reasons discussed in the foregoing opinion, the petition for review is hereby denied.

*So ordered.*