898 F.2d 165
 283 U.S.App.D.C. 151, 20 Envtl. L. Rep. 20,595
 GENERAL MOTORS CORPORATION, Petitioner,
v.
NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, Respondent,
Mercedes-Benz of North America, Inc., Intervenor.
MERCEDES-BENZ OF NORTH AMERICA, INC., Petitioner,
v.
NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION, Respondent.
 Nos. 88-1816, 88-1831.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 9, 1990.
Decided Feb. 27, 1990.
 
 Petition for Review of Orders of the National Highway Traffic Safety Administration.
 John Gibson Mullan, Washington, D.C., with whom Thomas L. Arnett, Detroit, Mich., and Edward W. Warren were on the brief, for petitioner, General Motors Corp., in No. 88-1816. Arthur F. Sampson, III, Washington, D.C., also entered an appearance for petitioner, General Motors Corp.
 David A. Vaughan, with whom Christopher F. Corr and Gregory J. Spak, Washington, D.C., were on the brief, for petitioner, Mercedes-Benz of North America, Inc., in No. 88-1831 and intervenor in No. 88-1816.
 Kenneth N. Weinstein, Asst. Chief Counsel, Nat. Highway Traffic Safety Admin., with whom Stuart M. Gerson, Asst. Atty. Gen., Barbara C. Biddle, Dept. of Justice and Stephen P. Wood, Acting Chief Counsel, Nat. Highway Traffic Safety Admin., were on the brief, for respondents in Nos. 88-1816 and 88-1831. John F. Cordes and Mark B. Stern, Dept. of Justice, and Erika Z. Jones, Washington, D.C., and Susan L. Rives, Nat. Highway Traffic Safety Admin., also entered appearances for respondents in both cases.
 Before WALD, Chief Judge, and RUTH B. GINSBURG, Circuit Judge, and ROBINSON, Senior Circuit Judge.
 Opinion for the Court filed by Chief Judge WALD.
 WALD, Chief Judge:
 
 
 1
 In November 1987, General Motors ("GM") petitioned the National Highway Traffic Safety Administration ("NHTSA") to amend the statutorily-imposed fuel economy standard for passenger cars manufactured in model year ("MY") 1985. Several months earlier, Mercedes-Benz of North America ("MBNA") had petitioned NHTSA for rulemaking to amend both the MYs 1984 and 1985 standards for passenger cars.
 
 
 2
 NHTSA denied both petitions, concluding that retroactive amendments, i.e., amendments made after the beginning of the model year in question, would be inconsistent with the statutory scheme of the fuel economy law. NHTSA also denied a second petition from GM which asked NHTSA to reconsider its previous decision, and grant a one-time-only retroactive amendment. Both GM and MBNA petitioned for review of their respective NHTSA orders, and MBNA intervened in GM's appeal.
 
 
 3
 We find that NHTSA's decision to deny the petitions based on its interpretation of the scope of its statutory authority was reasonable. Accordingly, we affirm NHTSA's orders and deny the petitions for review.[1]
 
 I. BACKGROUND
 A. Statutory Framework
 
 4
 Congress enacted the Energy Policy Conservation Act ("EPCA" or "the Act"), Pub.L. No. 94-163, 89 Stat. 871 (1975), as a comprehensive response to the energy crisis of 1973. The Act established a major program to bring about improved motor vehicle fuel efficiency. To meet those goals, Congress established a system of mandatory corporate average fuel economy ("CAFE") standards, which required manufacturers to improve by 50% the fuel economy of their fleets by MY 1980, and to double that target by MY 1985. See S.Rep. No. 94-179, 94th Cong., 1st Sess. 20 (1975) U.S.Code Cong. & Admin.News 1975, p. 1762.
 
 
 5
 At issue in this appeal are the CAFE standards for passenger automobiles manufactured in MYs 1984 and 1985. Congress itself set 27.5 mpg as the standard for passenger cars manufactured in MY 1985 and thereafter, see 15 U.S.C. Sec. 2002(a)(1), but delegated to the Department of Transportation ("DOT" or "the Secretary") responsibility for setting passenger car CAFE standards for MYs 1981 through 1984. See 15 U.S.C. Sec. 2002(a)(3) (requiring standards to be set at the maximum feasible average fuel economy level). DOT, in turn, delegated the task of administering the CAFE scheme to NHTSA. See 49 C.F.R. Sec. 1.50(f). Pursuant to that authority, NHTSA set the MY 1984 standard at 27.0 mpg. See 42 Fed.Reg. 33,534 (June 30, 1977). Congress also delegated authority to the agency to set standards for vehicles other than passenger automobiles, see 15 U.S.C. Sec. 2002(b) ("light trucks"), and to grant exemptions from the CAFE standards for manufacturers of fewer than 10,000 passenger cars, see 15 U.S.C. Sec. 2002(c).
 
 
 6
 NHTSA has substantial discretion in deciding whether to amend previously-established fuel economy standards. See Center for Auto Safety v. NHTSA, 793 F.2d 1322 (D.C.Cir.1986) ("CAS I "). When it decides to do so, however, it must comply with the Administrative Procedure Act, and it must set the amended standard at the maximum feasible average fuel economy level.[2] See 15 U.S.C. Sec. 2002(f)(1) (NHTSA may "by rule, from time to time," amend standards that it has prescribed for automobiles manufactured in MYs 1981 through 1984, for light trucks, or for manufacturers of fewer than 10,000 automobiles) and 15 U.S.C. Sec. 2002(a)(4) (NHTSA may, by rule, amend the congressionally-prescribed standard for MY 1985, or for any subsequent model year).
 
 
 7
 As to the timing of amendments, Congress specified that any amendment "which has the effect of making any average fuel economy standard more stringent shall be (A) promulgated ... at least 18 months prior to the beginning of the model year to which such amendment will apply." 15 U.S.C. Sec. 2002(f)(2) (emphasis supplied). This case involves petitions for rulemakings that sought to have the CAFE standards made less stringent, a type of adjustment not explicitly addressed in the statute.
 
 B. Procedural History of the Case
 
 8
 This case requires us to examine NHTSA's decision not to initiate rulemaking proceedings to amend the industry-wide CAFE standards for passenger cars for MYs 1984 and 1985. As just described those standards were set at 27.0 and 27.5 mpg, respectively, and have never been amended.
 
 
 9
 1. MBNA's Petition. In 1986, NHTSA notified MBNA that it had not achieved the 27.0 mpg CAFE standard for its automobiles manufactured in MY 1984. Since MBNA had earned sufficient credits in previous years, no penalty was assessed.[3] On May 4, 1987, NHTSA notified MBNA that it would also not achieve the MY 1985 standard, and that it no longer had sufficient carryover credits to forestall a penalty.[4] In August 1987, MBNA petitioned for rulemaking requesting that NHTSA reduce the MY 1984 standard from 27.0 mpg to 26.0 mpg, and the MY 1985 standard from 27.5 mpg to 26.0 mpg.
 
 
 10
 MBNA claimed that due to the unforeseen decline in gasoline prices during the mid-1980s and the attendant shift in consumer demand away from more fuel-efficient models (events which occurred after the MY 1984 and MY 1985 standards were established), the CAFE levels set by Congress and by NHTSA exceeded the industry's actual "maximum feasible average fuel economy level" for those years. According to NHTSA's own data, the domestic fleet's actual average fuel economy in MY 1984 was 25.6 mpg, 51 Fed.Reg. 6,341, 6,342 (Feb. 21, 1986), and in MY 1985 it was 26.2 mpg, 52 Fed.Reg. 10,841, 10,842 (April 3, 1987). Accordingly, MBNA argued, the MY 1984 and 1985 standards must be reduced to comport with the statutory mandate that the standards be set at the "maximum feasible" level.
 
 
 11
 2. GM's Petition. GM was notified that it would fall short of the MY 1985 CAFE level in May 1987. GM submitted a carry-back plan for earning offsetting credits in future model years, which NHTSA approved. Nevertheless, faced with uncertainties as to whether it would actually earn sufficient credits in future years given pending legal challenges that might result in even more stringent standards for those future years, GM also petitioned for rulemaking to reduce the MY 1985 standard from 27.5 mpg to 26.0 mpg.
 
 
 12
 GM claimed that since the Act did not place any time limits on amendments that would lower the CAFE standards, NHTSA should grant its rulemaking petition even though MY 1985 had ended. Moreover, GM argued, lowering the MY 1985 CAFE standard was justified under the same rationale that led NHTSA to lower the congressionally-prescribed CAFE standard of 27.5 mpg for MYs 1986 through 1989. See Final Rule, 50 Fed.Reg. 40,528 (1985) (codified at 49 C.F.R. Sec. 531.5 (1986)) (setting the MY 1986 standard at 26.0 mpg); Final Rule, 51 Fed.Reg. 35,594 (1986) (codified at 49 C.F.R. Sec. 531.5 (1987)) (setting the MYs 1987 and 1988 at 26.0 mpg); Final Rule, 53 Fed.Reg. 39,275 (1988) (to be codified at 49 C.F.R. Sec. 531.5) (setting the MY 1989 standard at 26.5 mpg);[5] see also 54 Fed.Reg. 21,985 (1989) (terminating rulemaking to lower the MY 1990 CAFE standard). Each of those rulemakings, however, was concluded prior to the beginning of the model year in question.
 
 
 13
 3. NHTSA's Denial of the Initial Petitions. NHTSA denied both MBNA's and GM's petitions. See Denial of Petitions for Rulemaking, 53 Fed.Reg. 15,241 (1988). In so doing, NHTSA acknowledged that the MY 1985 standard may have exceeded "actual" industry capabilities for that model year. Nevertheless, NHTSA vehemently disputed the manufacturers' implication that it had any duty to amend the CAFE standards whenever the established CAFE standard differs from the level actually achieved by the industry. Particularly "in the absence of a timely petition for rulemaking from the regulated industry," NHTSA was unwilling to disrupt the CAFE scheme by amending a CAFE standard for a model year that had long since ended. 53 Fed.Reg. at 15,243. In so holding, NHTSA reaffirmed a position first espoused in 1984 that amendments reducing a standard may only be made before the beginning of the model year. 53 Fed.Reg. at 15,245.
 
 
 14
 4. GM's Second Petition. In response to NHTSA's decision, GM filed a petition for reconsideration of the agency's denial. GM sought clarification of the agency's rationale and also asked for a one-time-only reduction of the MY 1985 standard. GM argued that it was not fair for NHTSA to apply its policy against retroactive amendments to GM because NHTSA's initial announcement of its policy came after the deadline for filing a prior-to-model-year petition for MY 1985. See 49 Fed.Reg. 22,516, 22,519 (May 30, 1984); 49 Fed.Reg. 41,250 (Oct. 22, 1984).[6]
 
 
 15
 5. NHTSA's Denial of GM's Second Petition. NHTSA again declined to initiate a rulemaking. See Denial of Petition, 53 Fed.Reg. 39,115 (1988). NHTSA reiterated its position that retroactive amendments would be inconsistent with the EPCA scheme. It also declined to consider a one-time-only retroactive amendment to benefit GM because its interpretation of the statute did not permit it to make a retroactive reduction to benefit one manufacturer in derogation of its general obligations under the EPCA scheme.
 
 
 16
 Petitioners appeal NHTSA's decision on the ground that the agency misconceived the limits of its authority to grant retroactive amendments to lower the CAFE standard for a given model year.
 
 II. ANALYSIS
 A. The Controlling Effect of Bowen
 
 17
 Two months after the agency denied GM's second petition, the Supreme Court addressed retroactive rulemaking in Bowen v. Georgetown University Hospital, 488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). The Court held that a grant of legislative rulemaking authority will not be understood "to encompass the power to promulgate retroactive rules unless that power is conveyed in express terms." 109 S.Ct. at 471. On appeal, NHTSA argues that beyond the independent validity of its petition denials, any retroactive amendment of the CAFE standards is barred by the Bowen decision.
 
 
 18
 We do not find Bowen controlling. While Bowen does create a presumption of statutory construction against retroactive rulemaking, it does not establish an absolute prohibition against such rulemaking. Bowen, nevertheless, does send a clear signal that agencies and courts must find congressional authorization for retroactive rulemaking in the particular law they are construing. Because NHTSA's decision not to initiate retroactive rulemaking was based on a reasonable construction of its statutory authority, however, we need not speculate whether the agency could have interpreted EPCA, consistently with Bowen, to authorize retroactive rulemaking. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).
 
 B. Standard of Review
 
 19
 An agency's refusal to institute a rulemaking is considered final agency action, and is subject to review in this court pursuant to 15 U.S.C. Sec. 2004(a). See also Center for Auto Safety v. NHTSA, 710 F.2d 842 (D.C.Cir.1983). We review an agency's denial of a petition for rulemaking under the Administrative Procedure Act's arbitrary or capricious standard, see 5 U.S.C. Sec. 706(2)(A), although our review is especially narrow. See, e.g., American Horse Protection Association v. Lyng, 812 F.2d 1 (D.C.Cir.1987).
 
 
 20
 Beyond those general principles, our review is guided by Chevron analysis. Under Chevron step one, if Congress has clearly spoken on the issue, then "that intention is the law and must be given effect." Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9. If the statute is "silent or ambiguous with respect to the specific issue," we proceed to Chevron step two analysis, and if "the agency's answer is a permissible construction of the statute," we must defer. Chevron, 467 U.S. at 843, 104 S.Ct. at 2782.
 
 C. Ascertaining Congressional Intent
 
 21
 Under Chevron step one analysis, we use traditional tools of statutory construction to determine whether Congress had "an intention on the precise question at issue." Chevron, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9. To ascertain congressional intent, we look to the "particular statutory language at issue, as well as the language and design of the statute as a whole," K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988), and, where appropriate, its legislative history. Ohio v. United States Department of the Interior, 880 F.2d 432, 441 (D.C.Cir.1989).
 
 
 22
 The precise question at issue here is whether Congress intended to bar NHTSA from requiring that amendments to reduce the CAFE standard be made prior to the beginning of the model year. After examining the text, statutory structure, and legislative history, we find that Congress has not clearly spoken on that question.
 
 
 23
 We begin with the statutory text. EPCA's CAFE amendment provisions are silent with respect to whether an amendment making a CAFE standard less stringent must be issued before the model year begins, or by any precise point in time. See 15 U.S.C. Secs. 2002(a)(4) and (f)(1). Looking to the statutory scheme as a whole, we find that the statute does contain an explicit deadline for any amendment that has the effect of making an average fuel economy standard more stringent. Such an amendment must be promulgated "at least 18 months prior to the beginning of the model year to which such amendment will apply." 15 U.S.C. Sec. 2002(f)(2). And, the statute contains explicit deadlines for purposes other than amending the CAFE standards. See, e.g., 15 U.S.C. Secs. 2002(a)(3) and (b) (deadlines for establishing passenger car standards for MYs 1981-1984 and light truck standards); 15 U.S.C. Sec. 2003(d)(3) (deadline for promulgating testing and calculation procedures).
 
 
 24
 Petitioners argue that the presence of these explicit deadlines in the statute and the absence of any express deadline for reductions of CAFE levels makes clear that Congress did not intend there to be a deadline for CAFE reduction amendments. See generally Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion of statutory provisions) (citations omitted).
 
 
 25
 We are unable to perceive any such congressional intent. The existence of deadlines for amendments that have prospective effect only is not necessarily evidence from which to infer a clear congressional intent to allow retroactive actions without regard to any deadlines.[7] The failure to prescribe an express deadline for CAFE reductions could mean either that no deadline was contemplated by Congress, or that Congress left the choice to NHTSA whether or not to impose a deadline in the interests of smooth operation of the CAFE law.
 
 
 26
 The latter interpretation is consistent with the bill's legislative history. In the original Senate bill, all amendments to CAFE standards were required to be promulgated "at least 18 months prior to the beginning of the model year." S. 1883, Sec. 504(a)(6). See S.Rep. No. 94-179, 94th Cong., 1st Sess. 21, 39 (1975). As enacted, however, the statute contained the 18-month lead time requirement only for amendments that made the CAFE standard more stringent. In explaining this change, the Conference Report stated:
 
 
 27
 Average fuel economy standards prescribed by [NHTSA] for passenger automobiles in model years after 1980, for non-passenger automobiles, and for passenger automobiles manufactured by manufacturers of fewer than 10,000 passenger automobiles may be amended from time to time as long as each such amendment satisfies the 18 month rule--i.e., any amendment which has the effect of making an average fuel economy standard more stringent must be promulgated at least 18 months prior to the beginning of the model year to which such amendment will apply. An amendment which has the effect of making an average fuel economy standard less stringent can be promulgated at any time prior to the beginning of the model year in question.
 
 
 28
 S.Conf.Rep. No. 516, 94th Cong., 1st Sess. 157 (1975).
 
 
 29
 We believe that the excerpt supports our conclusion that Congress did not have any clear intention about establishing a deadline for CAFE reductions. Rejection of the 18-month rule for CAFE reductions reflects Congress' recognition that it was not necessary to mandate a specific lead time for manufacturers when a standard is being reduced. It does not necessarily imply that Congress intended to prohibit NHTSA from imposing any deadline on CAFE reductions, particularly given the final sentence of the Conference Report excerpt.[8]
 
 
 30
 Before proceeding to our Chevron step two analysis, we address briefly petitioners' contention that NHTSA refused to initiate retroactive rulemakings because it believed that EPCA affirmatively precluded it from exercising its discretion in that manner. They argue, in effect, that NHTSA itself viewed the case as a Chevron step one type of case in which Congress had clearly "addressed the precise question at issue," and precluded retroactive amendments. They cite NHTSA's statements to the effect that the "correct interpretation of the statute does not permit such amendments," 53 Fed.Reg. at 39,116, and reason therefrom that unless the agency's interpretation of its authority can be upheld under step one of Chevron, this court must remand to the agency for it to truly exercise its Chevron step two-type discretion in interpreting the statute.
 
 
 31
 There is indeed authority tending to support the proposition that when an agency's decision rests on a supposed mandate by Congress and the agency is later determined to be wrong as to the mandate, a remand may be required for it to exercise its discretion on the issue. See, e.g., Phillips Petroleum v. Federal Energy Regulatory Commission, 792 F.2d 1165 (D.C.Cir.1986) (remand required where agency erroneously believed itself compelled to a certain result by a Supreme Court decision); Securities and Exchange Commission v. Chenery, 318 U.S. 80, 94-95, 63 S.Ct. 454, 462-63, 87 L.Ed. 626 (1943). In this case, however, we do not believe NHTSA based its decision on an incorrect assumption that it was compelled to reach its result by a statutory command which left it no discretion to interpret the law as it thought reasonable. Cf. Prill v. National Labor Relations Board, 755 F.2d 941 (D.C.Cir.), cert. denied sub nom. Meyers Indus., Inc. v. Prill, 474 U.S. 948, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985).
 
 
 32
 NHTSA did exercise its discretion in interpreting the statutory scheme in light of its policy judgment and expertise. As NHTSA explained, "[t]here is no single statement in Title V that clearly bans retroactive amendment, but the agency believes that the correct interpretation of the statute does not permit such amendments," and "it would be an abuse of the discretion granted by Title V if the agency were to exercise that discretion in a manner that would disturb the statutory scheme." 53 Fed.Reg. at 39,116 (emphasis added). We read NHTSA as saying that, taking into account the entire statutory scheme, and its efficient administration, the agency finds the "correct" interpretation to be one that eschews retroactive changes in CAFE standards. It would, we believe, be unreasonable to read NHTSA's statement as an averment that it has made a choice without regard to any policies or problems in administering the Act. Such a reading would ignore catch phrases like "exercise ... discretion" and "disturb the statutory scheme" that exude agency policymaking. Every time an agency interprets a statute it must of course take heed of elements such as text and history as well as factors of policy and administration. Only in those cases where the agency has stopped at text and history without weaving into the calculus policy and administrative concerns might a court which finds the textual or historical analysis nondeterminative feel compelled to remand the case to the agency for an exercise of its discretion. This is not such a case.
 
 
 33
 D. Reviewing the Reasonableness of NHTSA's Decision
 
 
 34
 Since we are unable to discern precise congressional intent on the issue of retroactively amending the CAFE standards, we must defer to the agency's interpretation of its statute so long as it "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute...." Chevron, 467 U.S. at 845, 104 S.Ct. at 2783 (citations omitted). In our view, NHTSA's decision does just that.
 
 
 35
 The EPCA scheme embodies a carefully-crafted balance of conflicting policies, over which NHTSA exerts considerable control. See Public Citizen v. NHTSA, 848 F.2d 256 (D.C.Cir.1988). We first examine NHTSA's assessment that it would be inconsistent with that statutory scheme and its policy objectives to lower the industry-wide CAFE standards after the model year had begun. We then investigate petitioners' contention that we need not defer to NHTSA's decision because it is inconsistent with prior agency action granting retroactive amendments.
 
 
 36
 1. Disruption of Statutory Scheme. Petitioners contend that retroactive amendments would not disrupt the EPCA scheme, and that NHTSA's concerns to that effect are overblown. In fact, they argue that unamended, excessive CAFE standards themselves undermine the scheme because they lead to inappropriate CAFE shortfalls.
 
 
 37
 NHTSA's analysis provides two responses to that contention. First, as NHTSA said in its initial policy statement on the timing of CAFE amendments, Congress intended CAFE standards to be established before production begins in each model year to encourage achievement of particular fuel economy levels. Post-model year amendments, on the other hand, would simply ratify past conduct. See 49 Fed.Reg. 41,253, 41,255 (1984). Second, NHTSA believed that retroactive amendments are inconsistent with the manner in which Congress chose to deal with manufacturers whose actual CAFE levels for a given model year fall short of or exceed CAFE standards for that model year.
 
 
 38
 In our view, NHTSA struck an appropriate balance between the need for the auto industry as a whole to achieve steady progress toward EPCA's energy conservation goal and the practical constraints on individual manufacturers that would impede that goal. To achieve EPCA's fuel economy goals, Congress provided the industry with a clear CAFE target for 1985 and beyond. But, in light of the constraints on individual manufacturers, Congress also included provisions in the CAFE scheme that permit flexibility for them. That carefully-designed flexibility has limits, however. In that context, NHTSA determined that it would be an abuse of its authority to amend the CAFE standards after the model year had begun because it would disrupt the manner in which Congress chose to deal with manufacturer CAFE shortfalls and excesses.
 
 
 39
 In particular, NHTSA said that retroactive amendments of the CAFE standards would disrupt the manner in which Congress chose to deal with noncompliance and civil penalties. To assure compliance with EPCA, Congress imposed a system of financial penalties for companies failing to meet the annual CAFE standards. 15 U.S.C. Secs. 2007 and 2008(b)(1)(A). NHTSA can compromise, modify, or remit a penalty only where it is necessary to prevent insolvency, where the shortfall resulted from an act of God, strike or a fire, or where the Federal Trade Commission certifies that modification is necessary to prevent a substantial lessening of competition within the automobile industry. 15 U.S.C. Secs. 2008(b)(3) and (4); see also 15 U.S.C. Sec. 2002(l )(3) (provision specifying NHTSA can refund a civil penalty in the amount of any credits earned during subsequent three years).
 
 
 40
 Lowering the CAFE standards after the model year had begun would undermine the limits Congress placed on NHTSA's authority to mitigate penalties. NHTSA concluded that if Congress had intended to permit retroactive amendments any time a civil penalty appeared to present difficulties for a manufacturer, it would not have needed to provide this specific and narrow penalty mitigation authority.
 
 
 41
 NHTSA's conclusion is supported by the legislative history of the penalty-mitigation provision. The original Senate version of the mitigation provision would have allowed the agency to waive or mitigate civil penalties to the extent that a manufacturer's noncompliance was attributable to an "unanticipated retail sales mix." S. 1883, Sec. 508(b)(3); S.Rep. No. 94-179, 94th Cong., 1st Sess. 25, 44 (1975). The final bill, however, did not include retail sales mix as a justification for mitigating penalties. GM and MBNA based their claimed inability to meet the CAFE standards for MYs 1984 and 1985 on an "unanticipated retail sales mix." NHTSA reasoned that if it were to grant their petitions, it would have the effect of mitigating civil penalties already paid by MBNA and of forgiving the large shortfall incurred by GM in that year, thereby specifically undermining Congress' decision to preclude mitigation based on unanticipated consumer demand shifts. To do so would negate Congress' decision not to let the industry off the hook under such circumstances.[9]
 
 
 42
 NHTSA also determined that retroactive amendments would be inconsistent with the statutory scheme of establishing annual standards, but permitting compliance with them through the earning of credits to handle shortfalls. Recognizing that manufacturers would not always be able to attain the CAFE standard for a particular year, Congress built into the statute additional means for compliance. Through a credit mechanism, manufacturers can avoid financial liability for one year's shortfall if they exceed the annual CAFE standards in other years. 15 U.S.C. Sec. 2002(l ).
 
 
 43
 Since 1980, credits earned in one model year (one credit is earned per each tenth of a mile by which the standard has been surpassed, multiplied by the number of automobiles it has manufactured that model year) are available to offset any penalties incurred in the preceding three model years, or as a cushion against future deficiencies in the subsequent three model years. 15 U.S.C. Sec. 2007(b).[10] In other words, credits earned in any particular model year have a six model year life during which they can count in favor of a manufacturer which falls below CAFE requirements. See CAS I, 793 F.2d at 1325.
 
 
 44
 In NHTSA's opinion, retroactive reductions would make the credit mechanism redundant and largely irrelevant. The legislative history of the 1980 amendments that extended the availability of credits from one to three years supports NHTSA's view. The objective of the three-year timeframe was to improve flexibility, provide better planning, and provide an incentive to manufacturers to exceed the standards as a safeguard against future shortfalls. See H.R.Rep. No. 96-1026, 96th Cong., 2d Sess. 19 (1980). Congress seemed intent on achieving this additional flexibility without compromising the steady progress toward the ultimate fuel economy goal. See H.R.Rep. No. 96-1026, 96th Cong., 2d Sess. 18 (1980). NHTSA reasonably concluded that Congress would not have been so intent on building this additional flexibility into the complicated credit scheme if the agency was expected to freely amend standards retroactively to account for industry-wide or manufacturer-specific shortfalls. 53 Fed.Reg. at 15,243.
 
 
 45
 For these reasons, we conclude that NHTSA had reason to be concerned about potential disruption to the EPCA program from reducing the CAFE standards after the model year was underway.
 
 
 46
 2. NHTSA's Other Policy Considerations. NHTSA also stated that retroactive reductions of CAFE standards would be inequitable to those manufacturers that had already absorbed the costs and burdens of complying with the original standards. 53 Fed.Reg. at 15,244. NHTSA further noted that retroactive reductions could discourage future compliance with standards if manufacturers believed that retroactive amendments might be available down the line. Such concerns are legitimate and provide additional support for the reasonableness of the agency's decision.
 
 
 47
 3. Consistency of Prior Agency Actions. An agency's consistently held interpretation of a statutory provision is entitled to considerable deference. See Immigration and Naturalization Service v. Cardoza-Fonseca, 480 U.S. 421, 446 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987). On the other hand, where an agency's "interpretation is inconsistent with its prior analysis in similar situations without any acknowledgement of the fact, or cogent explanation as to why," the "result reached by the agency is impermissible under the second prong of Chevron." King Broadcasting Co. v. FCC, 860 F.2d 465, 470 (D.C.Cir.1988). Petitioners contend that NHTSA's view of its statutory authority to act retroactively has been inconsistent, and is, therefore, entitled to little deference.
 
 
 48
 a. Prior agency statements. In November 1983, Ford petitioned NHTSA to lower the light truck CAFE standards for MYs 1984 and 1985. In response, NHTSA published a notice of proposed rulemaking in May 1984, in which it proposed to deny Ford's request as to the MY 1984 standards because the model year was already underway. See 49 Fed.Reg. at 22,516. Ford then withdrew its petition for MY 1984, but requested that the agency issue a more definitive interpretation about its amendment authority. NHTSA responded to Ford by a publicly-available letter in August 1984, confirming the interpretation that its authority to reduce a standard was limited to a time period before the beginning of the model year and repeated that conclusion in its final rule reducing the MY 1985 light truck standards. See 49 Fed.Reg. 41,250, 41,254 (1984).
 
 
 49
 In that decision, NHTSA acknowledged that the statute does not expressly preclude retroactive rulemaking. After reviewing the legislative history and the policies underlying EPCA, NHTSA nevertheless concluded that it would be inconsistent with congressional intent to reduce the stringency of CAFE standards after the beginning of the model year in question. It also refused to specify a precise date by which petitions to amend fuel economy standards must be filed. Instead, it announced that petitions must be filed in time to permit the agency to complete a rulemaking proceeding on the petition prior to the start of the model year, 49 Fed.Reg. at 41,255, and that the time necessary for responding to petitions would vary depending on the type of issues raised in them.[11]
 
 
 50
 NHTSA's position in this proceeding is clearly consistent with its 1984 position.[12] And, if an inconsistency exists between that position and NHTSA's general statements in the 1977 final rule establishing the MYs 1981-1984 standards, to the effect that amendments reducing a standard for a model year could be issued "at any time," it must be pointed out that the 1977 statement carries little weight since no question of retroactive amendment of a CAFE standard was at issue there. See Final Rule, 42 Fed.Reg. 33,534 (June 30, 1977). We are more persuaded by the fact that the first time the retroactivity question arose, in 1984, the agency articulated the same basic position that it has reaffirmed in these proceedings. We are, accordingly, justified in granting deference to an agency position that has been consistently stated since that time.
 
 
 51
 b. Amendment of Light Truck Standards. Petitioners complain that NHTSA's current position is inconsistent with its prior decisions to amend the MY 1982 and MY 1985 standards for light trucks after the beginning of the respective model years. Upon careful review of NHTSA's prior rulemaking action, however, we do not find the circumstances of those rulemakings to conflict with NHTSA's conclusion that retroactive amendments of a CAFE standard after the start of a model year are inconsistent with the statutory scheme.
 
 
 52
 In February 1982, several months after MY 1982 had begun, NHTSA adopted an alternative compliance option for light truck manufacturers--permitting manufacturers to combine their 2-wheel and 4-wheel drive light truck fleets to comply with CAFE. Interim Final Rule, 47 Fed.Reg. 7,245, 7,247 (1982) (implementing the new option on an interim basis while allowing for public comment); Final Rule, 47 Fed.Reg. 32,721 (1982). That action does not support petitioners' claim of inconsistency, however, because it was not a "retroactive amendment" of a CAFE standard. NHTSA accurately described it as a change in conditions of compliance made available to light truck manufacturers. 47 Fed.Reg. at 7,247 ("[T]his action makes no change in the level of fuel economy required of manufacturers, but does allow a manufacturer the choice of placing all of its 2-wheel drive and 4-wheel drive light trucks together ... [and] provides an additional method of compliance, i.e., selling larger numbers of the higher fuel economy 2-wheel drive light trucks.").
 
 
 53
 NHTSA's final rule amending the MY 1985 light truck standards was issued on October 22, 1984, at a time when NHTSA considered the model year to begin in "the fall." NHTSA was obviously acting in compliance with the opinion it espoused contemporaneously that CAFE amendments should be promulgated prior to the beginning of the model year. See 49 Fed.Reg. at 41,255. Even were we to conclude that the model year actually began on October 1, and the MY 1985 light truck amendment came later on October 22, we would not likely label a three week delay as inconsistent with NHTSA's articulated timeframe, especially when the petition itself had been timely filed (unlike GM's and MBNA's petition in this case). Therefore, we find nothing sufficiently inconsistent in NHTSA's treatment of light truck standards to warrant less deference in this case.
 
 
 54
 c. Low-Volume Manufacturer Exemptions. A low-volume manufacturer is a manufacturer that produces fewer than 10,000 passenger cars annually. NHTSA may exempt low-volume manufacturers from the generally applicable average fuel economy standards for passenger cars if those standards are more stringent than the maximum feasible average fuel economy for that manufacturer and if NHTSA establishes an alternative standard at the manufacturer's maximum level. 15 U.S.C. Sec. 2002(c). NHTSA can establish these alternative standards for each individual manufacturer, for all low-volume manufacturers, or for a class of automobile. NHTSA has chosen to proceed on an individual manufacturer basis. See 49 C.F.R. pt. 531.
 
 
 55
 NHTSA has established procedures governing the submission and disposition of petitions filed by low-volume manufacturers. 49 C.F.R. pt. 525. Pursuant to those regulations, manufacturers must submit a petition no later than 24 months before the beginning of the affected model year. As a general rule, NHTSA will dismiss untimely petitions, unless the petitioner can show good cause for later submission. See, e.g., 54 Fed.Reg. 40,665 (Oct. 3, 1989) (denying several exemption petitions as not timely filed, but finding good cause to accept late filing for one manufacturer where company's financial difficulties were extremely serious). Despite the lead time it requires, NHTSA has occasionally exercised its discretion to grant such exemptions even after the model year in question had begun. See, e.g., 44 Fed.Reg. 3,708 (Jan. 18, 1979) (exemption for Excalibur for MY 1978) and 44 Fed.Reg. 11,548 (March 1, 1979) (exemption for Maserati for MY 1978), aff'd, Center for Auto Safety v. Claybrook, 627 F.2d 346 (D.C.Cir.1980); 46 Fed.Reg. 29,944 (June 4, 1981) (exemption for Rolls-Royce for MYs 1979 and 1980); 47 Fed.Reg. 55,684 (Dec. 13, 1982) (exemptions for Aston Martin, Avanti, Excalibur, and Rolls-Royce for MYs 1981-1985).
 
 
 56
 Petitioners assert that NHTSA's willingness to grant post-model year exemptions to these individual manufacturers is inconsistent with its position that post-model year CAFE reductions would disrupt the CAFE scheme. We disagree. As NHTSA explained, granting retroactive exemptions from the generally applicable standard for low-volume manufacturers does not have the same potential for disrupting the statutory scheme as retroactively amending that standard as it applies to the rest of the industry. See 53 Fed.Reg. at 15,246.
 
 
 57
 The statutory provisions governing low-volume manufacturers and their legislative history send out strong signals that these manufacturers are to be treated differently from the rest of the industry.[13] And, the difference in treatment is justified on sound policy grounds. Low-volume manufacturers cumulatively account for only a fraction of one percent of the total annual production of passenger automobiles. See 53 Fed.Reg. at 15,246. Congress believed exemptions for low-volume manufacturers were necessary given their limited engineering staff and modest financial resources. See 44 Fed.Reg. 3,710 (Jan. 18, 1979). And, each exemption applies to only one manufacturer. As a result, NHTSA is well within its authority to proceed on a case-by-case basis to exempt small manufacturers from the industry-wide CAFE standards, and establish an individualized CAFE for each exempted manufacturer.
 
 
 58
 In our view, NHTSA properly determined that such exemptions do not affect the validity of the industry-wide standard, or the compliance of major manufacturers, both of which are compromised by retroactive amendments to the generally applicable CAFE standard. Even assuming a general policy of granting retroactive exemptions after the model year had begun for a segment of the industry accounting for significantly less than one percent of the product, NHTSA could reasonably have a different policy for the other 99 percent.
 
 III. CONCLUSION
 
 59
 NHTSA has concluded that Congress intended to provide certainty and finality with regard to a model year's applicable CAFE standards, to permit planning by the manufacturers and the agency, and that cutting off amendments once a model year has begun will accomplish those goals. We believe that is a reasonable interpretation of the EPCA scheme. Therefore, we hold that NHTSA's decision not to initiate a rulemaking to amend retroactively the CAFE standards for MYs 1984 and 1985 represented a sound exercise of its discretion and was consistent with EPCA's statutory purposes and provisions. Accordingly, we affirm NHTSA's decision.
 
 
 60
 Petitions for review denied.
 
 
 
 [1]
 NHTSA claimed that MBNA did not seek judicial review of the April 1988 denial of its petition for rulemaking within the 59-day period provided by Sec. 504(a) of the Act, 15 U.S.C. Sec. 2004(a), and that, therefore, this court lacked jurisdiction to review MBNA's petition for review of that denial. Since we rule against General Motors on the same substantive legal question that underlies MBNA's petition, we need not reach the threshold, now academic, issue of the timeliness of MBNA's petition for review
 
 
 [2]
 In determining the maximum feasible level, NHTSA must consider four factors: technological feasibility; economic practicability; the effect of other motor vehicle standards on fuel economy; and, the need of the nation to conserve fuel. 15 U.S.C. Sec. 2002(e). See Center for Auto Safety v. NHTSA, 793 F.2d 1322, 1341 (D.C.Cir.1986) (balancing of factors is specifically committed to the agency by Congress)
 
 
 [3]
 In Part II.D.1. of this opinion, we discuss the statutory provisions governing the awarding of credits and assessing of penalties for exceeding or falling short of the CAFE standards. See 15 U.S.C. Secs. 2002(l ) and 2008
 
 
 [4]
 NHTSA has since conducted an enforcement proceeding in which MBNA was found to have violated Sec. 2007(a)(1) of the Act by failing to comply with the 27.5 mpg standard for MY 1985. MBNA was assessed a civil penalty in the amount of $5,509,400. In the course of that enforcement proceeding, NHTSA concluded that MBNA could not attack the validity of the CAFE standards in the context of an enforcement proceeding. NHTSA, Order Affirming Summary Decision, Docket No. 45610 (Nov. 22, 1989). MBNA has appealed the Enforcement Order in this court. See Mercedes-Benz of North America, Inc. v. NHTSA, No. 89-1762 (Docketed Dec. 20, 1989)
 
 
 [5]
 Each of those decisions has been the subject of court challenge by environmental and consumer groups who questioned the propriety of NHTSA's substantive determination of the "maximum feasible" CAFE level. This court upheld the MY 1986 reduction in Public Citizen v. NHTSA, 848 F.2d 256 (D.C.Cir.1988), and appeals of the MYs 1987-1989 standards are still pending. See Competitive Enterprise Institute, et al. v. National Highway Traffic Safety Administration, Nos. 86-1646 and 89-1278 (D.C.Cir. argued October 19, 1989) and City of Los Angeles and the City of New York, et al. v. National Highway Traffic Safety Administration, Nos. 86-1649, 86-1651, 89-1277, and 89-1403 (D.C.Cir. argued Oct. 19, 1989). This court also upheld NHTSA's decision to amend the fuel economy standards for light trucks for the 1985 model year. Center for Auto Safety v. NHTSA, 793 F.2d 1322 (D.C.Cir.1986)
 
 
 [6]
 GM raised a second argument based on this court's decision in Center for Auto Safety v. Thomas, 847 F.2d 843 (D.C.Cir.1988), vacated, 856 F.2d 1557 (D.C.Cir.1988) ("CAS II "). The CAS II opinion has since been vacated, and the original EPA rule reinstated, so that decision is no longer relevant to this case
 
 
 [7]
 While we do not rely on the Bowen case to control the outcome here, we do point out that its caution as to the need for clear authorization for retroactive rulemaking has an analogue in our own analysis: we will not lightly infer the existence of retroactive amending power unless Congress signals its presence
 
 
 [8]
 For purposes of Chevron step one analysis, however, we do not consider the sentence sufficient evidence of Congress' intent to compel a deadline on reductions of the CAFE standards after the start of the model year
 
 
 [9]
 Contrary to petitioners' contention, this court's decision in CAS I in no way conflicts with NHTSA's view. In CAS I, consumer groups challenged prospectively-established CAFE standards, claiming that in determining them, NHTSA gave impermissible weight to shifts in consumer demand. They argued that since Congress expressly rejected consumer preference as a reason for relief from penalties, NHTSA should also not be able to rely on consumer demand in setting the CAFE standards so that manufacturers could avoid paying future penalties. This court rejected their argument, concluding that they had not offered any reason why consumer choice could not be an element of standard-setting even though Congress rejected it as a reason to waive penalties
 What is at issue here is not whether consumer demand can be a factor in prospective standard-setting while not being a permissible basis for penalty mitigation. It is instead whether consumer demand as a basis for retroactive standard-setting can become a de facto basis for waiving penalties once incurred when Congress explicitly rejected consumer demand as a justification for waiving penalties. NHTSA reasonably concluded that the prospective standard-setting at issue in CAS I does not interfere with congressional limitations on mitigation of penalties in the same manner as retroactive amendment interferes with those limits.
 
 
 [10]
 The 1980 amendments also provided manufacturers with an additional means of forestalling financial penalties by submitting a plan for earning credits in the future. See 15 U.S.C. Sec. 2002(l )(1)(C). GM itself had such a plan approved for MY 1985, and faces no current penalties for that year despite its shortfall
 
 
 [11]
 Obviously, GM's and MBNA's petitions, filed years after the end of the relevant model years, did not satisfy NHTSA's guidelines on the timing of petitions to amend. NHTSA did not base its conclusion to deny those petitions on the untimeliness of their filing, however. Instead, NHTSA reaffirmed its 1984 position that retroactive amendments to reduce CAFE standards are inconsistent with EPCA's scheme. For that reason, NHTSA also denied GM's request in its second petition for a one-time-only retroactive amendment. GM had contended that NHTSA's 1984 policy statement came too late for GM to have complied with NHTSA's request to receive petitions for amendments sufficiently in advance of the beginning of the model year to enable NHTSA to complete necessary rulemaking prior to the start of that model year. See 49 Fed.Reg. at 41,255. NHTSA found that as of May 1984, manufacturers were on notice that NHTSA had tentatively concluded that it would not entertain petitions for rulemaking for model years that had already begun. 49 Fed.Reg. 22,5165 (May 20, 1984). In any event, NHTSA concluded that its interpretation of the statutory scheme did not provide for a one-time, equitable retroactive reduction of the CAFE under the circumstances presented. See 53 Fed.Reg. at 39,117-118. We find no abuse of discretion in NHTSA's decision not to confer a one-time benefit on GM
 
 
 [12]
 See also In Re Center for Auto Safety, 793 F.2d 1346, 1348-49 (D.C.Cir.1986) (noting that NHTSA had adopted the EPCA Conference Report's interpretation that CAFE reductions can be promulgated at any time prior to the beginning of the model year)
 
 
 [13]
 Congress showed its unique concern for this class of manufacturers again in enacting the 1980 amendments to the Act. NHTSA had recommended that they be completely exempted from the Act because little if any fuel savings resulted from its enforcement against them, and the paperwork involved in establishing the need for exemptions was substantial. Congress retained the exemption scheme, but amended the statute to allow NHTSA to grant exemptions for two model years at once. 15 U.S.C. Sec. 2002(c)(2); see Pub.L. No. 96-425, 94 Stat. 1821 (Oct. 10, 1980); see also H.R.Rep. No. 96-1026, 96th Cong., 2d Sess. 12-14 (1980). In so doing, Congress reemphasized its position that low-volume manufacturers should be included under the EPCA rubric, but, from a practical standpoint, they should be treated differently from the rest of the industry