NATIONAL ASSOCIATION OF LIFE UNDERWRITERS, et al., Plaintiffs,

v.

Robert L. CLARKE, et al., Defendants,

and

United States National Bank of Oregon, Defendant–Intervenor.

INDEPENDENT INSURANCE AGENTS OF AMERICA, et al., Plaintiffs,

v.

Robert L. CLARKE, et al., Defendants,

and

United States National Bank of Oregon, Defendant–Intervenor.

Civ. A. Nos. 86–3042, 86–3045.

United States District Court, District of Columbia.

May 8, 1990.

Jonathan B. Sallet, Miller, Cassidy, Larocca & Lewin, Washington, D.C., for plaintiffs.

Thomas Hirt and Patrick Sorek, U.S. Dept. of Justice, Washington, D.C., for defendants.

Kenneth L. Bachman, Jr., Cleary, Gottlieb, Steen & Hamilton, Washington, D.C., for defendant-intervenor.

## OPINION

JOHN H. PRATT, District Judge.

### I. *Introduction*

The above action is only the latest chapter in the long running battle for turf on the part of two powerful industries, each of which is subject to governmental regulation. In this case, the insurance industry seeks protection from incursions into its claimed territory by the commercial banking industry. On behalf of life, health, property, and casualty insurance agents throughout the United States, various trade associations brought this consolidated action for declaratory and injunctive relief against the Office of the Comptroller of the Currency ("OCC"), the Comptroller himself, and the United States.[1] After the complaints were filed, the United States Bank of Oregon ("USBO"), a national bank chartered under the National Bank Act, 12 U.S.C. §§ 21–216d (1988) (sometimes "NBA"), intervened as an additional defendant.

■ At issue is whether the Comptroller reasonably concluded that section 92 of the NBA, *id.* § 92,[2] authorized USBO, through a subsidiary bank insurance agency, to solicit and sell insurance to customers located throughout the country. Plaintiffs contend that the Comptroller's decision permits USBO and its parent, U.S. Bancorp, a bank holding company registered under the Bank Holding Company Act of 1956, *id.* §§ 1841–1849 (1988) (sometimes "BHCA"), to violate alleged geographic restrictions on insurance activities contained in both the NBA and the BHCA.[3] *Id.* §§ 92, 1843(c)(8). There being no dispute as to any material fact, defendants and USBO moved for summary judgment or dismissal, and plaintiffs crossmoved for summary judgment. The issues have been fully briefed by the parties and the amici curiae.[4]

### II. *Background*

#### A. USBO's "New Activities" Proposal

As a national bank, USBO is subject to the regulatory jurisdiction of the Comptroller, the principal expositor of the NBA. *See Clarke v. Securities Industry Association,* 479 U.S. 388, 403–04, 107 S.Ct. 750, 759–60, 93 L.Ed.2d 757 (1987) (citations omitted); *First National Bank v. Smith,*

---

1. We hereby grant defendants' unopposed request that the complaint, which alleges nothing against the United States *eo nomine,* be summarily dismissed against that party.

2. It is worth noting that this section no longer appears in the United States Code. Enacted by Act of Sept. 7, 1916, ch. 461, 39 Stat. 753 (1916), it apparently was *inadvertently* repealed in 1918. *See* Act of Apr. 5, 1918, ch. 45, § 20, 40 Stat. 512 (1918). However, since Congress, other courts, and the Comptroller have presumed its continuing validity, *see, e.g., Commissioner v. First Sec. Bank,* 405 U.S. 394, 401 & n. 12, 92 S.Ct. 1085, 1090 & n. 12, 31 L.Ed.2d 318 (1972); *First Nat'l Bank v. Smith,* 610 F.2d 1258, 1261 n. 6 (5th Cir.1980); *Saxon v. Georgia Ass'n of Indep. Ins. Agents,* 399 F.2d 1010, 1013 (5th Cir. 1968); Garn–St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, 96 Stat. 1511 (1982) [hereinafter Garn–St. Germain Act] (purporting to amend § 92); 12 C.F.R. § 7.7100 (1989), we will assume that the statute exists *in proprio vigore.*

3. Defendants claim that two plaintiffs, the National Association of Life Underwriters ("NALU") and the Oregon Life Underwriters Association ("OLUA"), lack standing because they represent insurance underwriters rather than agents. From plaintiffs' uncontested response, however, it is clear that NALU and OLUA represent insurance agents, not underwriters. As such, they plainly have standing to proceed. *See Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 403, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987) ("[C]ompetitors who allege an injury that implicates the policies of the National Bank Act are very reasonable candidates to seek review of the Comptroller's rulings.").

4. Plaintiffs have requested leave to file two supplemental exhibits. Proposed Exhibit 16, the text of a June 10, 1987, address by Richard V. Fitzgerald, Chief Counsel of the Comptroller, is a *post hoc* commentary on the mental processes that led to the Comptroller's decision, and thus is not relevant to this case. *See Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam) (focal point for judicial review of Comptroller's decision should be administrative record already in existence, not some new record); *Environmental Defense Fund v. Costle,* 657 F.2d 275, 284 (D.C.Cir.1981) (judicial review of agency action normally confined to full administrative record before agency at time decision was made). Accordingly, leave to file this exhibit is denied. Leave is granted with respect to proposed Exhibit 17, a re-typed version of a previously filed letter from defendants' counsel.

610 F.2d 1258, 1264 (5th Cir.1980); 12 U.S.C. §§ 1–216d; 12 C.F.R. §§ 1.1, 4.1a–4.-11 (1989). Under OCC regulations, a national bank wishing to perform "new activities" through a subsidiary must submit a written proposal to the Deputy Comptroller for the district in which the bank's principal office is located. 12 C.F.R. § 5.34(d)(1)(i). Upon receiving such a proposal, the Comptroller evaluates whether the activities would "exceed those legally permissible for a national bank operating subsidiary." *Id.* § 5.34(d)(1)(ii). If the Comptroller requires more than thirty days for this evaluation, he may extend the review period, in which case the bank must await "written notification" before engaging in the "new activities." *Id.*

U.S. Bancorp, USBO's parent, is regulated by the Federal Reserve Board (sometimes the "Board"), which administers the BHCA.[5] *See Whitney National Bank v. Bank of New Orleans & Trust Co.,* 379 U.S. 411, 419, 85 S.Ct. 551, 556–57, 13 L.Ed.2d 386 (1965); *Northeast Bancorp, Inc. v. Board of Governors,* 849 F.2d 1499, 1501 (D.C.Cir.1988); 12 U.S.C. §§ 1841–1849; 12 C.F.R. § 225.1. U.S. Bancorp did not submit an application to the Board concerning the proposed "new activities" of USBO. Consequently, the Board was never requested to nor did it approve U.S. Bancorp's indirect involvement in certain insurance activities.

Pursuant to OCC regulations, USBO, whose principal office is in Portland, Oregon, submitted a "new activities" proposal to the OCC's Western District on October 16, 1984. USBO sought to offer, through its subsidiary U.S. Bank Insurance Agency, Inc. ("Bank Agency"), "a full range of insurance products" from a branch office of USBO in the small town of Banks, Oregon.[6] Letter from T. Dalrymple to Billy C. Wood (Oct. 16, 1984). USBO relied on section 92 of the NBA and a December 1, 1983, opinion letter[7] to conduct the proposed activities. *See id.*

The primary question raised by the proposal was whether any geographic restrictions applied to the solicitation or sale of insurance authorized by section 92 of the NBA. That section provides that any national bank:

located and doing business *in any place the population of which does not exceed five thousand inhabitants,* as shown by the last preceding decennial census, *may, under such rules and regulations as may be prescribed by the Comptroller ..., act as the agent for any fire, life, or other insurance company authorized ...* to do business in [the state in which the bank is located], *by soliciting and selling insurance and collecting premiums on policies issued by such company....*

12 U.S.C. § 92 (emphasis added).[8] A similar provision applies to bank holding companies. *See id.* § 1843(c)(8)(C). Section 4(c)(8) of the BHCA prohibits a bank hold-

---

5. Although plaintiffs allege violations of the Bank Holding Company Act, neither U.S. Bancorp nor the Federal Reserve Board is a party to this action.

6. The 1980 census population of Banks was 489.

7. In 1983, USBO contacted the Assistant Commissioner of the Oregon Department of Commerce concerning the possibility of USBO's acting as an insurance agent through branches in small Oregon communities. The Commissioner requested an opinion from the OCC as to the types of activities authorized by 12 U.S.C. § 92. Letter from Robert E. Miller to Joe Pogar, Regional Counsel (Oct. 7, 1983). The OCC's resultant opinion letter stated, in pertinent part: "[A] national bank or its office may act as an insurance agent without geographic restriction to the community [in which] it is located. However,

whether a national bank or its office may act as an insurance agent on an interstate basis is an unsettled issue." Letter from Debra A. Chong, Senior Attorney, Western District, to Robert E. Miller at 1 (Dec. 1, 1983) [hereinafter Chong Letter].

8. As originally enacted in 1916, § 92 also authorized such national banks to act as brokers or agents "in making or procuring loans on real estate located within one hundred miles of the" community. 39 Stat. 753 (1916). This provision was deleted in 1982, Garn–St. Germain Act, *supra* note 2, 96 Stat. 1511, because Congress considered it "obsolete and unjustifiably restrictive." H.R.Conf.Rep. No. 899, 97th Cong., 2d Sess. 89 (1982); *accord* S.Rep. No. 536, 97th Cong., 2d Sess. 27 (1982) [hereinafter Senate Report], U.S.Code Cong. & Admin.News 1982, 3054, 3081.

ing company from engaging in, or acquiring and retaining "shares of any company" engaged in, nonbanking activities unless the Board determines that such activities are "so closely related to banking ... as to be a proper incident thereto." *Id.* § 1843(c)(8); *see Independent Insurance Agents of America, Inc. v. Board of Governors*, 835 F.2d 1452, 1454 (D.C.Cir.1987). Subject to a few limited exceptions, the BHCA precludes the Board from finding that the provision of "insurance as a principal, agent, or broker" is "closely related to banking." *See* 12 U.S.C. § 1843(c)(8). One exception is "any insurance agency activity in a place" with "a population not exceeding five thousand (as shown by the last preceding decennial census)." *Id.* § 1843(c)(8)(C); *see Independent Insurance Agents*, 835 F.2d at 1455 nn. 4–5. This provision was added to the BHCA in

1982,[9] and was "intended to conform to" Board regulations that already permitted such activity,[10] "as well as the authority in" section 92 of the NBA. Senate Report, *supra* note 8, at 38, U.S.Code Cong. & Admin.News 1982, p. 3092.

■ Since 1963, over twenty-five years ago, the Comptroller has applied section 92 to any branch office "located in a community ... of less than 5,000," regardless of whether the bank's principal office is located in a larger community. 12 C.F.R. § 7.7100 (first codified in 1971).[11] Similarly, a Board regulation allows a subsidiary of a bank holding company to engage "in any insurance agency activity in a place" the population of which does not exceed 5,000, provided the subsidiary "has a lending office" there. *Id.* § 225.25(a), (b)(8)(iii).[12] It is the Board's policy, how-

**9.** Garn–St. Germain Act, *supra* note 2, 96 Stat. 1536–37.

**10.** Beginning in 1971, the Board determined that certain types of insurance activities were "so closely related to banking" that bank holding companies could engage in them under the BHCA. "One of these was the sale of any insurance in a community that had a population not exceeding 5,000." *Independent Ins. Agents*, 835 F.2d at 1454. In 1979, the Board began to limit this exemption to bank holding companies that (1) had their principal place of business in a small town; and 2) operated another subsidiary serving the public in the small town in which they wished to sell insurance. *See id.* In 1986, after passage of the Garn–St. Germain Act, the Board deleted the principal place of business requirement from its new regulations, having determined that it was not mandated by either the text or the purpose of § 4(c)(8). 12 C.F.R. § 225.25(b)(8)(iii) (1989); *see Independent Ins. Agents*, 835 F.2d at 1455. The D.C. Circuit recently upheld the Board's decision against an attack waged by many of the same trade associations that are plaintiffs in this case. *See Independent Ins. Agents*, 835 F.2d at 1456–57.

**11.** After 23 years of silence, plaintiffs now assert that this interpretive ruling is invalid. They claim that Congress could not have intended to authorize insurance activities outside a bank's "headquartered location" because in 1916, when § 92 was enacted, branch banking did not exist. Plaintiffs emphasize that the McFadden Act, 12 U.S.C. §§ 36, 81, which authorizes national banks to conduct business through branch offices, was not passed until 1927.

This challenge, even if meritorious, is barred by laches. *Independent Bankers Ass'n of Am. v. Heimann*, 627 F.2d 486, 488 (D.C.Cir.1980).

Plaintiffs are trade associations "charged by [their] members with anticipating the impact of government rulings" concerning insurance activities by banks. *Id.* at 488. As such, their long delay in challenging this ruling is patently unreasonable. *See id.* (12 years held unreasonable). Further, since 1963, some national banks have invested substantial capital in insurance agency branches "that meet the ruling's requirements." *Id.; see, e.g.,* Letter from Michael J. O'Keefe, District Counsel, Midwestern District (June 19, 1986), Ex. 4 to Pls.Mem. [hereinafter O'Keefe Letter]; Letter from David H. Baris, Regional Counsel (Dec. 29, 1978), Ex. 2 to Pls. Mem. [hereinafter Baris Letter]. Equity will not protect those who "through years of silence ha[ve] created an impression of acquiescence that has led others to make substantial financial commitments." *Independent Bankers v. Heimann*, 627 F.2d at 488.

We also note that plaintiffs' challenge is based on a false premise. Contrary to their assertion, branch banking was not unknown in 1916. At the turn of the century, five national banks and 82 state banks operated a total of 119 branches. *First Nat'l Bank v. Walker Bank & Trust*, 385 U.S. 252, 257, 87 S.Ct. 492, 495, 17 L.Ed.2d 343 (1966) (citation omitted). By the end of 1923, several years prior to the enactment of the McFadden Act, 91 national banks and 580 state banks operated a total of 2,054 branches. *Id.* (citation omitted).

**12.** The D.C. Circuit recently upheld this regulation against an attack waged by many of the same trade associations that are plaintiffs in this case. *See Independent Ins. Agents*, 835 F.2d at 1456–57. *See supra* note 10.

ever, that solicitation and sales must be restricted to that place "and to other areas of less than 5,000 adjacent to" it. 51 Fed. Reg. 36,201, 36,206 (Oct. 9, 1986); *see also First United Bancshares, Inc.*, 73 Fed.Res. Bull. 162 (1987).

## B. The Comptroller's Approval Letter

The Comptroller notified USBO that review of its proposal would extend beyond thirty days, and that USBO could not conduct the proposed insurance activities unless the Comptroller communicated in writing that he had no objection. Letter from Rufus O. Burns, Jr., District Administrator, Western District, to T. Dalrymple (Oct. 24, 1984). Almost two years later, on August 18, 1986, the Comptroller approved USBO's proposal and, in so doing, authorized Bank Agency, the subsidiary of USBO, "to sell insurance to customers residing outside" Banks, Oregon. *See* Letter from Judith A. Walter, Senior Deputy Comptroller for National Operations, to T. Dalrymple at 4 (Aug. 18, 1986) [hereinafter "Approval Letter" or "Letter"].

The Approval Letter analyzed the text and legislative history of section 92, as well as relevant OCC rules and policies. Section 92, it found, was silent concerning the sale of insurance "to persons and businesses located in different states." *Id.* at 2–3. The Letter then explained that the original statute had included an express geographic restriction (100 miles) applicable to loans on real estate.[13] According to the Letter, this restriction, coupled with the absence of one on insurance activities, indicated "congressional intent not to limit geographically a bank's market area for its insurance products." *Id.* at 3 (relying on *expressio unius est exclusio alterius*).

The Approval Letter next explained that section 92's legislative history—essentially only a 1916 letter from Comptroller Williams to the Senate Banking and Currency Committee—did "not directly address

[the] geographic limitations" at issue. *Id.* Williams drafted and recommended the passage of what ultimately became section 92's insurance provision. *See id.; see also* 53 Cong.Rec. 11001 (1916).[14] Based on his comments, the Approval Letter concluded that the primary purpose of the insurance provision was to provide additional sources of revenue to national banks that, due to their location in small towns, "were having problems deriving a reasonable profit from their banking business." Approval Letter at 4 (citations omitted).

Allowing sales to customers outside the local population would further this purpose, the Letter reasoned, because the local population's demand for insurance might be too small "to improve significantly the bank's profitability...." *Id.* In this regard, the Letter emphasized that the Comptroller had never imposed any geographic restrictions on the insurance activities of small town national banks, and that no relevant restrictions existed under Oregon law. *Id.* The Letter did not address the proposal's legality under the BHCA.

Based on this analysis, the Approval Letter authorized Bank Agency to "sell insurance ... to existing and potential customers regardless of where [they] are located." *Id.* at 5. The only qualification was that Bank Agency "could not sell insurance ... to customers located in a state where the" underwriter was not licensed to do business. *Id.* Subsequently, Bank Agency began offering insurance to customers in a number of states. The Federal Reserve Board has never taken any action regarding U.S. Bancorp's indirect involvement in these activities.[15]

■ Plaintiffs assert that the Approval Letter, by authorizing geographically unlimited sales of insurance, sanctions violations of section 92 of the NBA and section

---

13. *See supra* note 8.

14. Williams recommended that insurance privileges be granted to national banks located and doing business in communities of 3,000 or fewer inhabitants. *See* 53 Cong.Rec. 11001. Prior

to passage, Congress changed the operative figure to 5,000. *See id.* at 11153.

15. The Board clearly has the power to act. *See* 12 U.S.C. § 1844(b), (c), (e).

4(c)(8) of the BHCA.[16] They seek to enjoin the Comptroller to withdraw the Approval Letter and to refrain from granting similar approval to any other national bank. While plaintiffs concede that we lack jurisdiction to adjudicate their BHCA claim,[17] they urge us to find that the Comptroller erroneously approved USBO's proposal without providing the Board an opportunity to consider its legality under the BHCA. We turn first to plaintiffs' claim under the NBA.

### III. Plaintiffs' Claim Under the National Banking Act

#### A. The Applicable Standard of Review

It is undisputed that the Approval Letter of August 18, 1986, is subject to judicial review under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1988). *See Camp v. Pitts*, 411 U.S. 138, 140, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106 (1973) (per curiam); *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 156–58, 90 S.Ct. 827, 831, 25 L.Ed.2d 184 (1970). However, since no hearing or formal findings were required for the Comptroller to pass on USBO's proposal, his decision can be overturned only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Camp v. Pitts*, 411 U.S. at 140–42, 93 S.Ct. at 1243–44 (citing 5 U.S.C. § 706(2)(A)); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–17, 91 S.Ct. 814, 822–24, 28 L.Ed.2d 136 (1971). Moreover, because we are called upon to review an agency's interpretation of its governing statute,[18] we are required to apply the landmark test announced in *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S.

837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Sullivan v. Everhart*, — U.S. —, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990).

Under *Chevron*, our first inquiry is whether Congress has directly addressed the issue of geographic restrictions on insurance sales under section 92. *Chevron*, 467 U.S. at 842, 104 S.Ct. at 2781. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* 467 U.S. at 842–43, 104 S.Ct. at 2781. However, "if the statute is silent or ambiguous with respect to [this] issue," we must determine whether the Comptroller's construction is "permissible," *id.* 467 U.S. at 843, 104 S.Ct. at 2781, that is, whether it is "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123, 108 S.Ct. 413, 420–21, 98 L.Ed.2d 429 (1987). In so doing, we must give "great weight" to any reasonable interpretation the Comptroller has adopted. *Clarke v. Securities Industry Association*, 479 U.S. at 403–04, 107 S.Ct. at 759–60 (citations omitted); *Investment Co. Institute v. Camp*, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971) (citation omitted); *see Securities Industry Association v. Board of Governors*, 821 F.2d 810, 813 (D.C.Cir.1987) (citations omitted), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988).

#### B. Chevron Step One

Plaintiffs contend that the Comptroller's interpretation contradicts the plain meaning of the statute. According to plaintiffs, section 92 clearly limits insurance sales and solicitation to the small community in which the bank's selling office is located, in

---

**16.** Originally, plaintiffs' wide ranging complaint also alleged that the Approval Letter violated the McFadden Act's restrictions on "branch banking," 12 U.S.C. §§ 36, 81. Plaintiffs dropped this claim after USBO affirmed that Bank Agency was the only branch engaged in the insurance activities at issue. *See* Pls.Mem. at 9 n. 6.

**17.** Pls.Reply Mem. at 18–19. The Board has exclusive jurisdiction in the first instance to determine the merits of a BHCA challenge, 12

U.S.C. § 1842, with judicial review only in a court of appeals, *id.* § 1848. *American Ins. Ass'n v. Clarke*, 865 F.2d 278, 288 (D.C.Cir.1988) (citing *Whitney Nat'l Bank*, 379 U.S. at 419–23, 85 S.Ct. at 556–59).

**18.** *See Clarke v. Securities Indus. Ass'n*, 479 U.S. at 403–04, 107 S.Ct. at 759–60 (citations omitted); *Investment Co. Inst. v. Camp*, 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971) (citation omitted).

this case Banks, Oregon. This of course misstates the facts. We agree with the Comptroller that the statute is silent on this issue.

As in all cases of statutory interpretation, we begin by examining the statutory language itself. *Investment Co. Inst. v. Conover*, 790 F.2d 925, 933 (D.C.Cir.), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 372 (1986); *see K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988) (citation omitted). Section 92 plainly permits Bank Agency, under such regulations as the Comptroller may prescribe, to solicit and sell insurance for any insurance company authorized to do business in Oregon. *See* 12 U.S.C. § 92. Beyond this, the statute says little. It does not refer to the market Bank Agency may serve, much less restrict solicitation or sales to the residents of Banks. *See id.* This silence, coupled with the express delegation of rulemaking authority to the Comptroller, suggests that Congress explicitly "left a gap for the [Comptroller] to fill." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781.

Plaintiffs argue, however, that a geographic restriction is implicit in the statute's requirement that the selling office be "located and doing business" in a small community. 12 U.S.C. § 92. Plaintiffs stretch the text too far. The phrase "located and doing business" plainly refers to the location of Bank Agency, not the customers to whom it may sell. Certainly USBO may accept deposits or extend credit to customers located outside Banks. Nowhere else does the NBA prohibit a national bank from offering its services to customers residing outside the community in which it is located. Indeed, an "affirmative indication" is required "to justify [a statutory] interpretation that would permit a national bank to engage in a business but"

prevent the bank from advertising it. *Franklin National Bank v. New York*, 347 U.S. 373, 377–78, 74 S.Ct. 550, 553, 98 L.Ed. 767 (1954). Therefore, if Congress had intended to impose such a prohibition here, it presumably would have done so expressly.

Plaintiffs also attempt to read a geographic restriction into section 92's provision that underwriters whose policies a national bank sells be authorized to do business in the state in which the bank's selling office is located. 12 U.S.C. § 92. Again plaintiffs stretch the text too far. We agree with defendants that this provision "does not even hint at any restriction on the location of customers, much less any requirement that ... customers reside only in the small community in which the [selling] office is located." USBO's Reply Mem. at 8. Rather, it seems merely to reflect Congress' recognition that insurance is essentially a state-regulated industry. *See* Dfs. Reply Mem. at 7–8.

At the risk of laboring the obvious, our first inquiry under *Chevron* does not end with the statutory language itself. It is helpful to examine "the language and design of the statute as a whole" for signs of congressional intent on the issue at hand. *K Mart Corp.*, 486 U.S. at 291, 108 S.Ct. at 1817 (citation omitted). We are not unmindful of the fact that, as originally enacted, section 92 also authorized small town national banks to engage in mortgage activities. 39 Stat. 753 (1916).[19] Significantly, Congress expressly restricted the scope of these activities. A small town national bank could procure "loans on real estate located within one hundred miles of the" bank's office. *Id.* This provision indicates that Congress knew how to impose geographic restrictions when it wanted to. It deliberately chose not to with respect to insurance activities.[20]

---

**19.** *See supra* note 8.

**20.** Under the maxim *expressio unius est exclusio alterius*, if " 'Congress includes particular language in one section of a statute but omits it in another ...', it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 300,

78 L.Ed.2d 17 (1983) (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972)). While this maxim is subordinate " 'to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose,' " *Herman & MacLean v. Huddleston*, 459 U.S. 375, 387 n. 23, 103 S.Ct. 683, 690, 74 L.Ed.2d 548 (1983) (quoting *SEC v. C.M. Joiner*

Turning next to the legislative history, we agree with the Comptroller that this history does not directly address the issue. The only substantive comments regarding section 92's insurance provision are contained in a letter to the Senate Banking and Currency Committee from Comptroller Williams, who drafted the provision and recommended its adoption by Congress. *See* 53 Cong.Rec. 11001 (1916). Williams was concerned with the competitive problems faced by many small national banks and their negative consequences for customers. While small national banks endowed with "average deposits" and "good management" could lend money at legal interest rates and still return a profit, "many banks," due to "small deposits," were unable to accomplish this task. *Id.* As a result, these banks often charged "excessive and in some cases grossly usurious" interest rates. *Id.* Williams believed the banks needed "additional sources of revenue" in order to compete more effectively "with local State banks and trust companies which are sometimes authorized ... to do a class of business not strictly that of commercial banking." *Id.* Accordingly, he recommended that national banks "located in villages and towns" with populations not in excess of 3,000 [21] "be permitted to act as agents for insurance companies ... and for the negotiation of loans on ... real estate...." [22] *Id.*

Plaintiffs, recognizing Williams' concern with small, struggling banks, question its applicability to USBO, the forty-fourth largest bank in the country. Clearly, however, the statute makes no distinction between profitable and unprofitable banks. *Cf. United States v. Naftalin,* 441 U.S. 768, 773, 99 S.Ct. 2077, 2081, 60 L.Ed.2d 624 (1979) ("The short answer is that Congress did not write the statute that way.").

Moreover, there is no indication that Williams *intended* to create such a distinction. Although he recognized that some small town banks were profitable, *see* 53 Cong.Rec. 11001, he recommended a provision that on its face applies to *all* small town banks, regardless of size or capitalization level. *See* 12 U.S.C. § 92. Finally, since 1963 the Comptroller has extended insurance privileges to branch offices, such as Bank Agency, that meet the statute's locational requirement. 12 C.F.R. § 7.7100. As we stated earlier, this interpretive ruling is no longer subject to challenge.[23] In light of these factors, we find plaintiffs' contention completely without merit.

Williams also expressed his views on why his proposal should be limited "to banks in small communities." 53 Cong. Rec. 11001. While "the new business" would help small town banks to become profitable, he doubted it would "assume such proportions as to distract [bank] officers ... from the principal business of banking." *Id.* For city banks, however, he thought the banking business already "afford[ed] ample scope for the energies of trained and expert bankers." *Id.* Williams also predicted that "in many small places" the market for insurance or mortgages would not "take up the entire time of an insurance broker," and that small town banks therefore would be unlikely "to trespass upon outside business naturally belonging to others." *Id.* Apparently, Williams assumed that a low demand for insurance in many small towns would deter insurance agents from soliciting there.

Plaintiffs argue that Williams' second rationale mandates a narrow construction of section 92. It evinces, they claim, a legislative intent to prohibit banks from marketing insurance outside the small towns in

---

*Leasing Corp.,* 320 U.S. 344, 350–51, 64 S.Ct. 120, 123, 88 L.Ed. 88 (1943)), there is no conflict between the two in this case. As discussed immediately *infra,* the primary purpose of the legislation does not require the imposition of geographic restrictions on insurance sales and solicitation.

**21.** Congress changed the operative number to 5,000. *See* 53 Cong.Rec. 11153.

**22.** Williams believed that the real estate should be located in the bank's region of the country, where the bank might "have some direct knowledge as to [its] value...." 53 Cong.Rec. 11001. He recommended no similar limitation on insurance activities.

**23.** *See supra* note 11.

which they are located. Again we disagree. Williams' statement bears the indicia of a prediction, not a prerequisite. *See id.* ("the bank is not ... *likely* to trespass") (emphasis added). As such, it is an insufficient basis for reading a geographic restriction into an otherwise silent statute. Moreover, we are not convinced that Williams would have written the statute any differently had he foreseen the societal changes that have rendered his prediction anachronistic.[24] As stated earlier, his primary goal was to provide small town banks with additional sources of revenue, not to protect the markets of competing insurance agents. *See id.* In the absence of a clearer indication of legislative intent, we are not free "to redraft" the statute "in an effort to achieve that which" plaintiffs believe Congress "ha[s] failed to do." *United States v. Locke,* 471 U.S. 84, 95, 105 S.Ct. 1785, 1792–93, 85 L.Ed.2d 64 (1985).

C.  Chevron Step Two

Because we hold that section 92 is silent with respect to geographic limitations on sales and solicitation, we must defer to any reasonable interpretation by the Comptroller on that issue. *See Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781; *Clinchfield Coal Co. v. Federal Mine Safety & Health Commission,* 895 F.2d 773 at 779–80 (D.C.Cir. 1990); *Securities Industry Association v. Board of Governors,* 821 F.2d at 813; *Investment Co. Institute v. FDIC,* 815 F.2d 1540, 1546 (D.C.Cir.), *cert. denied,* 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987). As our analysis under the first prong of *Chevron* indicates, "the literal language" of section 92 supports the Comptroller "and nothing in the legislative history" or the statute's purpose "casts doubt on [his] interpretation." *Northeast Bancorp,* 849 F.2d at 1503. According to plaintiffs, however, there are at least three reasons why the Approval Letter deserves no deference. First, they claim, it contravenes the general

policy reflected in the country's banking laws of separating banking from commerce. Second, they argue that section 92 and the BHCA's "small town" insurance activities provision should be construed together, and that the latter clearly restricts the geographic scope of solicitation and sales. Third, plaintiffs contend that the Comptroller's decision is inconsistent with prior agency rulings on the same issue.

### 1. The Policy of Separating Banking From Commerce

Plaintiffs maintain that the banking laws of this country reflect a clear congressional policy to separate banking from commerce. In the present case, however, neither the face of the statute nor the legislative history contradicts the Comptroller. Therefore, even assuming *arguendo* that plaintiffs' statement of general policy is correct,[25] their argument must fail. *See Investment Co. Institute v. FDIC,* 815 F.2d at 1549 (citing *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–82). "It is not our place to implement congressional policy in ways Congress itself fails to pursue." *Id.* (citing *Board of Governors v. Dimension Financial Corp.,* 474 U.S. 361, 373–74, 106 S.Ct. 681, 688–89, 88 L.Ed.2d 691 (1986); *TVA v. Hill,* 437 U.S. 153, 194–95, 98 S.Ct. 2279, 2301–02, 57 L.Ed.2d 117 (1978)); *see also Chevron,* 467 U.S. at 866, 104 S.Ct. at 2793.

### 2. The Effect of Section 4(c)(8)(C) of the Bank Holding Company Act

Plaintiffs next argue that section 4(c)(8)(C) of the Bank Holding Company Act and section 92 of the National Bank Act are *in pari materia*—that is, pertain to the same subject—and thus should be construed together. They maintain that section 4(c)(8)(C), the similar "small town" exception applicable to bank holding companies, "unequivocally limits the geographic scope" of insurance activities to the

---

**24.** We take judicial notice of the fact that this country is more densely populated and technologically advanced now than it was in 1916.

**25.** It is worth noting that § 92 is not the only "exception" to this "policy." For example, Congress has authorized national banks to deal in

securities of certain governmental entities and to offer investments in the form of commingled investment retirement accounts. Glass–Steagall Act, § 16, 12 U.S.C. § 24 (Seventh); *see Investment Co. Inst. v. Conover,* 790 F.2d 925.

small community in which the bank is located. Pls. Reply Mem. at 6. Plaintiffs assert that "[t]his parallel provision," which was passed in 1982, "sweeps away any ambiguity in the legislative history of section 92 itself." *Id.* at 5. In short, they ask us to find that section 92 is governed by the same geographic limitations they claim are mandated by section 4(c)(8)(C) of the BHCA. For the reasons that follow, we reject their interpretation.

Clearly, the language of the two provisions is not identical. Whereas section 4(c)(8)(C) authorizes "any insurance agency activity in a place" whose population does not exceed 5,000, 12 U.S.C. § 1843(c)(8)(C), section 92 empowers a national bank "located and doing business in" such a place to act as a general insurance agent. *Id.* § 92. As a general rule, "[l]anguage in one statute usually sheds little light upon the meaning of different language in another statute," and "[t]he use of the specific in the [former] cannot fairly be read as imposing a limitation upon the general provision in the [latter]." *Russello v. United States,* 464 U.S. 16, 25, 104 S.Ct. 296, 301, 78 L.Ed.2d 17 (1983). Therefore, even if section 4(c)(8)(C) plainly restricted solicitation and sales to a place whose population does not exceed 5,000,[26] there ordinarily would be no justification for reading that restriction into the less specific terms of section 92.

The canon of *in pari materia* is a rather narrow exception to the general rule that different statutes should be read differently. In this case, the canon simply does not apply. The two provisions were enacted over sixty-five years apart and deal with two different types of banking institutions, each subject to a distinct set of laws and regulations administered by separate agencies. *See Erlenbaugh v. United States,* 409 U.S. 239, 244, 93 S.Ct. 477, 480, 34 L.Ed.2d 446 (1972) (rule's application makes the most sense when the statutes are on the same subject and were enacted by the same Congress at the same time). In addition, the statutes were not "intended to serve the same function." *Id.* 409 U.S. at 245, 93 S.Ct. at 481. The BHCA provision is concerned with activities that are "so closely related to banking ... as to be a proper incident thereto," 12 U.S.C. § 1843(c)(8), whereas section 92 was designed to help small town banks increase their earnings by providing them with another source of revenue. *See* 53 Cong.Rec. 11001.

Section 4(c)(8) prohibits a bank holding company from engaging in, or owning "shares of any company" engaged in, non-banking activities unless the Board determines that such activities are "so closely related to banking ... as to be a proper incident thereto." 12 U.S.C. § 1843(c)(8); *see Independent Insurance Agents,* 835 F.2d at 1454. With a few exceptions, the statute precludes the Board from finding that the sale of "insurance as a principal, agent, or broker" is "closely related to banking." *See* 12 U.S.C. § 1843(c)(8). One exception is "any insurance agency activity in a place" whose population does not exceed 5,000. *Id.* § 1843(c)(8)(C); *see Independent Insurance Agents,* 835 F.2d at 1455 nn. 4–5.

Section 92 addresses a completely unrelated concern: the need to provide small town national banks with additional sources of revenue. The authority it confers is in no way tied to whether the insurance activity is "closely related to banking." *See* 12 U.S.C. § 92. In fact, section 92 is a specific exception to the general rule that national banks are limited to "such incidental powers as shall be neces-

---

**26.** We question whether the geographic scope of the BHCA's "small town" exception is "unequivocally limit[ed]." Pls.Reply Mem. at 6. Although § 4(c)(8)(C) was "intended to conform to" existing Board regulations, Senate Report, *supra* note 8, at 38, U.S.Code Cong. & Admin. News 1982, p. 3092, one of which limited "solicitation or sales ... to the small town and to other areas of less than 5,000 adjacent to" it, 51 Fed.Reg. at 36,206; *see First United Bancshares,* 73 Fed.Res.Bull. 162, the Board has subsequently departed from at least one of these regulations. *See Independent Ins. Agents,* 835 F.2d 1452 (agreeing with Board that statute did not compel principal place of business requirement); 12 C.F.R. § 225.25(b)(8)(iii); *see also supra* notes 10 & 12 and text accompanying note 12.

sary to carry on the business of banking." *Id.* § 24 (Seventh).

Although the BHCA provision was "intended to conform to," *inter alia*, "the authority in" section 92, Senate Report, *supra* note 8, at 38, U.S.Code Cong. & Admin.News 1982, p. 3092, this alone is an insufficient reason to hold that the two sections are *in pari materia.* In light of the countervailing considerations discussed above, we are confident that the sections need not be construed together.

Plaintiffs next posit that, in passing the BHCA provision, Congress assumed that section 92 imposed geographic restrictions on sales and solicitation. Congress' understanding is clear, plaintiffs theorize, from the fact that section 4(c)(8)(C) "unequivocally limits the geographic scope" of insurance activities, Pls. Reply Mem. at 6, and was "intended to conform to ... the authority in" section 92, Senate Report, *supra* note 8, at 38, U.S.Code Cong. & Admin. News 1982, p. 3092. This postulate, even if true, would not alter the reasonableness of the Comptroller's interpretation.

Our review in this case centers on congressional intent in 1916, when section 92 was enacted. Since nothing in the BHCA itself sheds light on that intent, plaintiffs cannot rely on the maxim, announced in *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969), that "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *See Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 116–18 & n. 13, 100 S.Ct. 2051, 2060–61 & n. 13, 64 L.Ed.2d 766 (1980). The maxim does not apply to "[a] mere statement in a conference report ... as to what the Committee believes an earlier statute meant...." *Id.* 447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n. 13; *see United States v. Southwestern Cable Co.*, 392 U.S. 157, 170, 88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001 (1968) (one Congress' views as to construction of statute adopted many years earlier by another Congress have minimal or no significance) (citations omitted). Indeed, "subsequent legislative history will

rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history *prior* to its enactment." *GTE Sylvania,* 447 U.S. at 118 n. 13, 100 S.Ct. at 2061 n. 13 (emphasis added); *cf., e.g., United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960) ("[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one.") (citation omitted). In this case, where "the literal language" of section 92 supports the Comptroller "and nothing in the legislative history" or the statute's purpose "casts doubt on [his] interpretation," *Northeast Bancorp,* 849 F.2d at 1503, we see no reason to depart from this principle.

At this juncture, it is worth underscoring that Congress has charged separate agencies with administering the BHCA and the NBA. As USBO points out, nothing in the BHCA or its legislative history suggests that the Comptroller of the Currency must cede his interpretive authority over section 92 in favor of accepting any interpretation of section 4(c)(8)(C) that the Federal Reserve Board may choose to adopt. USBO's Reply Mem. at 30–31. If Congress wishes to avoid inconsistent interpretations of the two provisions, Congress alone has the power to act. In the meantime, the agencies are free to implement any reasonable policy where Congress has left a gap. *See Chevron,* 467 U.S. at 866, 104 S.Ct. at 2793. The Comptroller has done just that. The fact that his conclusion may be at odds with the Board's is not our concern.

### 3. *Prior Comptroller Interpretations*

Where an agency's interpretation of a statutory provision " 'is inconsistent with its prior analysis in similar situations without any acknowledgement of the fact, or cogent explanation as to why,' the 'result reached by the agency is impermissible under the second prong of *Chevron.*' " *General Motors Corp. v. National Highway Traffic Safety Administration,* 898 F.2d 165 at 174 (D.C.Cir.1990) (quoting *King Broadcasting Co. v. FCC,* 860 F.2d 465, 470 (D.C.Cir.1988)). Plaintiffs assert that the Approval Letter is inconsistent with earlier positions taken by the Comptroller

regarding geographic restrictions under section 92. We conclude, however, that prior to the Approval Letter, the Comptroller had never undertaken a comprehensive analysis of or implemented a restrictive policy on this issue. *Compare National Black Media Coalition v. FCC,* 775 F.2d 342, 355 (D.C.Cir.1985) ("After announcing a prospective rule and applying it faithfully for six years, the Commission, in effect, ignored it here."). Moreover, even if the Approval Letter represented a departure from prior policy, the Comptroller certainly provided a "cogent explanation as to why." *King Broadcasting,* 860 F.2d at 470. Therefore, plaintiffs' argument must fail.

Plaintiffs rely on statements in a few opinion letters, but these do not support their assertion. First, each statement constituted informal advice or opinion, not a definitive announcement of policy. *Compare National Black Media Coalition,* 775 F.2d at 355 ("After announcing a prospective rule and applying it faithfully for six years, the Commission, in effect, ignored it here."). Second, none of the statements establishes the position plaintiffs urge—

that section 92 restricts insurance sales and solicitation to residents of the community in which the bank's selling office is located.[27]

Based on the foregoing analysis, we hold that the Comptroller's interpretation, being "rational and consistent with the statute," must be upheld. *NLRB v. United Food & Commercial Workers,* 484 U.S. at 123, 108 S.Ct. at 420–21; *see Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–82. We turn now to plaintiffs' claim under the BHCA.

## IV. *Plaintiffs' Claim Under the Bank Holding Company Act*

■ An independent issue from the reasonableness of the Comptroller's construction of section 92 is whether the BHCA bars U.S. Bancorp, USBO's parent, from "launching nationwide insurance activities" through Bank Agency, USBO's subsidiary. Pls. Reply Mem. at 18. While plaintiffs concede that we lack jurisdiction to decide the merits of this question,[28] they contend that the Comptroller erred by issuing the Approval Letter without providing the Board "an opportunity to consider the le-

27. The Comptroller's views on the geographic area a bank insurance agency may serve were first requested in mid–1970. *See* Letter from Robert Bloom, Chief Counsel, at 1 (July 17, 1970), Ex. 1 to Pls.Mem. [hereinafter Bloom Letter]. At that time, "[t]he only generalization" the Comptroller could "safely" make was that § 92 did not authorize a "significantly greater" "service area for the insurance activity ... than that of the banking activity of the owner bank." *Id.* at 2. While plaintiffs rely heavily on this statement, they ignore that the very next year the Comptroller did not object to a bank's using an official at its main office to solicit business for its branch insurance agency. *See* Letter from Thomas G. DeSnazo, Deputy Comptroller (June 9, 1971). They also overlook a 1978 "no objection" letter issued to a bank that proposed to sell insurance from its small town agency to customers of other branches located in larger towns. Baris Letter, *supra* note 11. As these and other letters demonstrate, the Comptroller has never limited insurance sales to the community in which the selling office is located.

Plaintiffs maintain, however, that the Bloom Letter announced at least *some* geographic restriction, and that the Approval Letter unjustifiably disregarded this policy. We reject this assertion for three independent reasons. First, we doubt that the Bloom Letter ever constituted a definitive policy statement. *See* O'Keefe Let-

ter, *supra* note 11, at 2; Chong Letter, *supra* note 7, at 1. Second, even if it did, the Approval Letter did not necessarily depart from it. The Bloom Letter simply opined that § 92 did not authorize a "significantly greater" "service area for the insurance activity ... than that of the banking activity of the owner bank." Bloom Letter at 2. As we stated earlier, a national bank is free to offer its services to customers residing outside the community in which it is located. *See Franklin Nat'l Bank,* 347 U.S. at 377–78, 74 S.Ct. at 553. Therefore, with today's advanced mail and wire services and expansive advertising capabilities, the service area for a bank's customary business is potentially worldwide. Plaintiffs have not alleged that USBO's banking activity is limited to Banks, Oregon, or that it does not extend to the states in which Bank Agency currently offers insurance. Third, the Comptroller certainly has offered a "cogent explanation as to why" he believes that no geographic restrictions apply. *King Broadcasting,* 860 F.2d at 470. The Approval Letter was over twice as long as the Bloom Letter, and engaged in a much more in-depth analysis of the language and purpose of § 92. Therefore, the Comptroller's decision, even if inconsistent with past policy, was completely justified. *See General Motors,* 898 F.2d at 174 (citing *King Broadcasting,* 860 F.2d at 470).

28. Pls.Reply Mem. at 18–19; *see supra* note 17.

gality of the proposed transaction." *Id.* at 19. Citing Supreme Court dictum that "exceptional circumstances ... may stay the hand of the Comptroller," *Whitney National Bank,* 379 U.S. at 426 n. 7, 85 S.Ct. at 560 n. 7, plaintiffs argue that an injunction would be appropriate in this case. They rely on *Independent Bankers Association of America v. Conover,* 603 F.Supp. 948, 958 (D.D.C.1985), in which the district court held that it was authorized to determine whether the Comptroller's action raised "substantial" questions under the BHCA and whether an injunction should issue to allow the Board to resolve those questions.

Courts have been reluctant to find the existence of "exceptional circumstances" that would warrant such an injunction. *See, e.g., American Insurance Association v. Clarke,* 865 F.2d 278, 288 (D.C.Cir. 1988). This reluctance is especially justified where an injunction would halt the operations of an ongoing business such as Bank Agency. *Cf. Marshall & Ilsley Corp. v. Heimann,* 652 F.2d 685, 701 n. 27 (7th Cir.1981) (where ultimate relief requested was not a mere stay of Comptroller's proposed action, as in *Whitney,* but divestiture of assets acquired almost four years earlier, stay pending Board review would be inappropriate), *cert. denied,* 455 U.S. 981, 102 S.Ct. 1489, 71 L.Ed.2d 691 (1982). Moreover, we take "notice of the obvious fact that the Board has not taken advantage of its ample opportunity to act on" USBO's proposal.[29] *Independent Bankers v. Conover,* 603 F.Supp. at 958 n. 17. "Although the *Whitney* test is not time-bound, it appears that the original concern was that the Board had 'not had an *opportunity* to determine' the issue presented." *Id.* (quoting *Whitney,* 379 U.S. at 425, 85 S.Ct. at 560) (emphasis in *Independent Bankers v. Conover*). In *Independent Bankers v. Conover,* the Board had taken no action for over one and a half years. *Id.* In the present case, almost four years have elapsed since the Comptroller issued the Approval Letter. During that time, the Board has taken no steps toward resolving the allegedly "substantial" BHCA issue arising therefrom. We are satisfied that under these circumstances there is no compelling need for an injunction.

## V. *Conclusion*

Based on the foregoing analysis, we hold:

(1) that section 92 of the NBA is silent on the issue of geographic restrictions on the solicitation and sale of insurance;

(2) that the Comptroller reasonably and permissibly interpreted section 92 as authorizing Bank Agency, a subsidiary of USBO, to offer insurance to customers residing outside Banks, Oregon, regardless of the geographic location of said customers;

(3) that there are no "exceptional circumstances" in this case warranting a stay of the Comptroller's decision pending Federal Reserve Board review of the legality of USBO's proposal under the BHCA; and

(4) plaintiffs' claims for relief should be addressed to Congress; this Court is the wrong forum.

An Order consistent with this Opinion has been entered this day.

## ORDER

Upon consideration of the motions of defendants and defendant-intervenor for dismissal or summary judgment and plaintiffs' cross-motion for summary judgment, the oppositions thereto, the briefs of amici curiae, and the entire record herein, and for the reasons stated in an accompanying Opinion entered this day, it is by the Court this 8th day of May, 1990,

ORDERED that summary judgment is entered in favor of defendants and defendant-intervenor on all counts; it is

ORDERED that plaintiffs' cross-motion for summary judgment is denied; and it is

FURTHER ORDERED that this case is dismissed with prejudice.

---

**29.** The Board clearly has the power to act. *See*     12 U.S.C. § 1844(b), (c), (e).